Joe W. Stout and Eudora H. Stout v. Commissioner.
Stout v. Commissioner
Docket No. 61477.
United States Tax Court
T.C. Memo 1959-16; 1959 Tax Ct. Memo LEXIS 229; 18 T.C.M. (CCH) 83; T.C.M. (RIA) 59016; January 30, 1959
*229 The petitioner and two other individuals held stock in the same relative proportions in two corporations, Southern Builders, Inc. and Elliott Homes, Inc. The individuals had subscribed, but not paid, for the stock of Elliott. Elliott owed Southern a part of the contract price for construction of an FHA insured building, which it was unable to pay. Elliott canceled the stock subscription indebtedness of the individuals and Southern canceled a part of the intercorporate indebtedness equal to the stock subscription indebtedness. Held, that the petitioners have failed to show error in the respondent's determination that the transaction constituted a payment by Southern of the petitioner's obligation and, therefore, the payment of a taxable dividend to the petitioner. Additions to tax under sections 294(d)(1)(A) and 294(d)(2) approved. Newman A. Townsend, Jr., Esq., Cameron Street, Raleigh, N. C., Duane Gilliam, Esq., and J. O. Tally, Jr., Esq., for the petitioners. Richard C. Forman, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency of $5,505.28 in income tax for the year 1951. He also determined that petitioners were liable for additions to tax under section 294(d) of the Internal Revenue Code of 1939 in the amounts of $473.89 and $900.50 for the years 1950 and 1951, respectively. The principal issue presented for decision is whether the respondent erred in determining that the petitioner received a taxable dividend in 1951 from Southern Builders, Inc. through payment by that corporation of the petitioner's obligation on a subscription for stock in another corporation. An alternative issue raised by the respondent by affirmative pleading is whether Southern's redemption of its own capital stock held by two of its stockholders constituted a dividend to petitioner, who thereby became the sole stockholder. Findings of Fact Some of the facts were stipulated and the stipulations are incorporated herein by *231 this reference. Petitioners are husband and wife who, during the taxable years 1950 and 1951, resided in Fayetteville, North Carolina. During such taxable years the petitioners filed joint income tax returns with the then collector of internal revenue for the district of North Carolina. Petitioners did not file declarations of estimated tax for the taxable years 1950 and 1951. The petitioner Joe W. Stout will hereinafter be referred to as the petitioner. Southern Builders, Inc., hereinafter referred to as Southern, is a North Carolina corporation organized in 1948, with head-quarters at Fayetteville and engaged in the general construction business. It kept its books and filed its tax returns on an accrual method of accounting and used a fiscal year ending the last day of February. On January 1, 1951, all of Southern's outstanding $100 par value common stock was owned as follows: Number
Name of Stockholder
of Shares
Joe W. Stout (petitioner)
63
H. J. Zeigler, Jr.
70
W. W. Crowell
6
139
On August 5, 1949, the same three individuals organized another corporation, Elliott Homes, Inc., hereinafter referred to as Elliott, under the corporation laws of *232 North Carolina, to build and operate a housing project in Fayetteville, North Carolina. It kept its books on an accrual method of accounting and used a fiscal year ended July 31. At the time Elliott was organized it was contemplated that the petitioner, Zeigler and Crowell would own the stock in Elliott in approximately the same proportion that they owned the stock in Southern. They initially subscribed for shares of the $100 par value common stock of Elliott as follows: Number
Name of Stockholder
of Shares
Stout (petitioner)
161
Zeigler
183
Crowell
14
358 None of the individuals paid the subscription price and there was set up on the books of Elliott on account thereof a total account receivable of $35,800. The original stock certificates of Elliott show the following information: No. of
Date Cert.
Date
Cert. No.
Shares
To Whom Issued
Surrendered
1-1-50
1
183
H. J. Zeigler, Jr.
8-22-51
1-1-50
2
161
Joe W. Stout (petitioner)
8-22-51
1-1-50
3
14
W. W. Crowell
8-22-51
358
Elliott entered into a contract with Southern wherein Southern agreed to perform the construction work for the housing *233 project at a price of $491,489. The project was financed by a loan insured by the Federal Housing Administration. In connection with the construction of the project the FHA required Southern to give a contractor's performance bond. Seaboard Surety Company (hereinafter referred to as Seaboard) was surety on this and other construction bonds given by Southern. Seaboard required the personal indemnity of the three individuals and required that the stock of Elliott be pledged as security for such personal indemnity. Seaboard looked primarily to Zeigler for its security. Pursuant to the requirement of Seaboard each of the individuals pledged his stock of Elliott with Seaboard as collateral. Each certificate was endorsed in blank and each endorsement was guaranteed by a bank. Southern paid the cost of construction during the construction period. The project was completed about October 1950. Because of the fact that the FHA required certain off-site work to be done the cost of the construction, and hence the liability of Elliott to Southern, was increased to the extent that the amount which Elliott owed Southern for construction was in excess of the amount which Elliott had obtained *234 under the FHA insured loan. Consequently, Elliott was unable to pay the full amount. After completion of the construction Elliott was indebted to Southern on the construction contract in an amount not less than $42,159.45, which it was unable to pay. Thereafter, at a time not precisely disclosed, Southern canceled $35,800 of the debt owing to it from Elliott for construction, and Elliott canceled the $35,800 subscription price of its stock owing by the individuals. The books of account of Elliott show that the receivable based upon such subscriptions was closed out through an offsetting reduction of the amount payable to Southern. The books of Elliott contain the following journal entry: Debit
Credit
7/31/51
Vouchers Payable
$35,800
Other a/c receivable
$35,800
To record exchange of stock as
partial payment on balance due
Southern Builders on contract.
The books of account of Southern show that it acquired the stock of Elliott by a credit of $35,800 against the amount due Southern by Elliott. The books of Southern contain the following journal entry: Debit
Credit
2/28/51
Investments - Elliott
Homes, Inc.
$35,800
Accounts Receivable
$35,800
To record purchase of stock of
Elliott Homes, Inc., by a reduc-
tion of the balance due on contract.
*235 The above entries on the books of both Elliott and Southern were adjusting entries made by the auditors at some undisclosed time after the close of the fiscal year of each corporation. The return of Southern for the fiscal year ended February 28, 1951 was filed on June 15, 1951, and Elliott's return for the fiscal year ended July 31, 1951 was filed about July 31, 1952. The balance sheet attached to Southern's return does not include stock of Elliott as an asset, but the amount of $35,800 is reflected in the balance sheet as a part of accounts receivable from the project in question. In carrying out this transaction the individuals and corporations consulted the head of an auditing firm and the attorney for the two corporations. It was also necessary to consult with the representatives of Seaboard since Seaboard was interested in all transactions involving these corporations. At some time in April 1951, Zeigler sustained injuries in an automobile accident and was confined to a hospital for several months. At that time he was having marital difficulties and this, together with his personal liability on the performance bonds, necessitated an adjustment of his financial affairs. *236 At a time not precisely shown, but probably in June or July 1951, the petitioner, Zeigler and Crowell entered into an agreement, apparently oral, which was approved by Seaboard, which contemplated that petitioner would turn in his stock to Elliott, and Zeigler and Crowell would turn in their stock to Southern and the individuals would continue apart. Several conferences were held by the petitioner and Zeigler, and at a conference held on July 13, 1951, attended by their attorney and the head of their accounting firm, they announced that an agreement had been reached. At that time the Elliott stock certificates were still being held by Seaboard. Seaboard released such stock certificates on or before August 22, 1951. As shown by the stock book of Elliott, as well as on the certificates themselves, the Elliott stock certificates which were then outstanding in the names of the petitioner, Crowell and Zeigler, totaling 358 shares, were surrendered to Elliott on August 22, 1951. They bore the endorsement of the individuals. On the same date there were issued by Elliott two new certificates, one for 332.56 shares, in the name of Zeigler, and one in the amount of 25.44 shares, in the name *237 of Crowell. The minutes of a special meeting of the stockholders of Southern held on August 22, 1951 recite that the petitioner stated that "all the stock in this Corporation previously held by H. J. Zeigler, Jr. and W. W. Crowell had been transferred and assigned to him." There appears on the books of account of Southern the following journal entry: Debit
Credit
2/28/52
Treasury Stock
$35,800
Investment - Elliott Homes,
Inc.
$35,800
To record exchange of 358 shares of
Elliott Homes, Inc., stock as follows: H. J. Zeigler
70 Shares
W. W. Crowell
6 Shares
The income tax returns filed by Southern for the fiscal years ended February 28, 1951 and February 29, 1952, showed accumulated earnings and profits in the respective amounts of $61,111.59 and $52,912.48. In the notice of deficiency the respondent determined, under authority of section 115(a) of the Internal Revenue Code of 1939, that the petitioner received in 1951 a taxable dividend in the amount of $16,100 from Southern, "inasmuch as your subscription to 161 shares of Common Stock of Elliott Homes, Inc. was paid by Southern." The accounting firm which did the auditing *238 work and prepared the returns for the corporations also prepared the joint individual income tax returns of the petitioners for the years 1949, 1950 and 1951. The head of this firm held a card permitting him to practice before the Treasury Department. He was a well qualified accountant and enjoyed a good reputation. He performed, or supervised, the work done by the firm for the petitioner. The joint return filed by the petitioners for the year 1949 showed wages received of $9,485.71, but this was partially offset by a net operating loss carryover of $9,180.81 from the year 1948, and consequently the return showed no tax due. The joint return for 1950 showed adjusted gross income of $22,247.16, net income of $21,247.16, and a tax liability of $4,416.12, against which it was shown that there had been withheld on Forms W-2 an amount of $1,256.85. The joint return for 1951 showed adjusted gross income of $13,377, net income of $11,874.09, and a tax liability of $2,110, of which $1,611.80 was shown to have been withheld on Forms W-2. The petitioners did not file declarations of estimated tax for 1950 and 1951. The accounting firm, in transmitting to the petitioners the returns for 1949 *239 and 1950, did not transmit declarations of estimated tax for the years 1950 and 1951. This firm was aware of the provisions of the Internal Revenue Code requiring the filing of declarations of estimated tax, but it was its opinion and observation that in the years in question the representatives of the Bureau of Internal Revenue were not asserting additions to tax as provided for by the Code in cases of failure to file declarations. It was the custom of the firm to advise each of its clients of the legal requirements as well as the prevailing practice of the Bureau of Internal Revenue of not asserting penalties, and to leave to the clients the decision as to whether they would file declarations. It did not advise the petitioner that he was not legally required to file declarations of estimated tax for the years in question. In the notice of deficiency the respondent determined additions to tax under section 294(d)(1)(A) for failure to file declarations of estimated tax for the years 1950 and 1951 in the respective amounts of $284.33 and $540.32, and additions for those years under section 294(d)(2) for substantial underestimation of estimated tax, in the respective amounts of $189.56 *240 and $360.21. The failure of the petitioners to file a declaration of estimated tax for each of the years 1950 and 1951 was due to wilful neglect and not due to reasonable cause. Opinion The respondent determined that within the meaning of section 115(a), Internal Revenue Code of 1939, the petitioner received a taxable dividend from Southern in the year 1951 in the amount of $16,100 "inasmuch as your subscription to 161 shares of Common Stock of Elliott Homes, Inc. was paid by Southern." His position is that Elliott canceled the petitioner's stock subscription debt and that of the other individuals in consideration of the cancellation by Southern of the inter-company indebtedness to the extent of $35,800, and that this resulted in the constructive payment of a dividend to the petitioner in the amount of his share of the subscription price, namely, $16,100. The petitioners do not deny that there was such an obligation to pay the subscription price originally contracted for, or that it was canceled by Elliott. Nor do they deny that there existed an indebtedness from Elliott to Southern in the amount of at least $42,159.45 resulting from the construction work done for Elliott by *241 Southern and that to the extent of $35,800 this indebtedness was canceled by Southern. They contend, however, that what transpired was that the petitioner and the other two stockholders of Elliott assigned to Southern, at some time between October 1950 and February 28, 1951, their subscriptions to stock of Elliott in partial satisfaction of the indebtedness of Elliott to Southern, that the stock of Elliott was issued to Southern, and that in the process of transferring the stock, Elliott treated the obligations of the individuals on their subscriptions as being satisfied. They argue, therefore, that since after the transaction the petitioner did not own any stock of Elliott, he received no economic benefit which could form the basis for holding that he was in receipt of a dividend from Southern. It should be noted that the transactions of August 22, 1951, whereby petitioner became the sole owner of Southern and Zeigler and Crowell became the sole owners of Elliott, apparently were unrelated to the cancellations of indebtedness above referred to, and that both the petitioners and the respondent proceed upon that premise. The respondent contends that Southern never became the owner *242 of the Elliott stock, and that the petitioner continued to own his shares. If this is so, we think the conclusion is inescapable that there was in substance a dividend paid by Southern to the petitioner in the amount of the subscription price which was satisfied, namely, $16,100. It is well established that the formality of the declaration of a dividend is not necessary and that a payment by a corporation for the benefit of a stockholder, as for example, a discharge of his indebtedness, will constitute the constructive receipt of a dividend. In Wall v. United States (C.A. 4), 164 Fed. (2d) 462, the Court of Appeals stated: "It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. Douglas v. Willcuts, 296 U.S. 1 * * *; United States v. Boston & Maine R. Co., 279 U.S. 732 * * *; Old Colony Trust Co. v. Commissioner, 279 U.S. 716 * * *. The transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditor; and so if a corporation, instead of paying a dividend to a stockholder, pays a *243 debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt." Since the respondent has determined that these transactions resulted in the payment of a dividend to the petitioner, the burden of proof is upon the petitioners and, to prevail, they must prove that as a result of this transaction Southern became the owner of the Elliott stock. Much of the argument of each party goes to the significance of certain entries made on the books of both Southern and Elliott, which entries are set forth in the Findings of Fact. The petitioner relies principally upon an entry dated February 28, 1951, which was the date of the end of Southern's fiscal year, showing a debit to investments and a credit to accounts receivable, each in the amount of $35,800, with a notation that it is to record purchase of stock of Elliott by a reduction of the balance due on contract. Book entries, of course, while evidence of the facts which they purport to record, are not conclusive. Doyle v. Mitchell Bros. Co., 247 U.S. 179; Commissioner v. North Jersey T. Ins. Co. (C.A. 3), 79 Fed. (2d) 492, *244 affirming a decision of this Court; Woods Lumber Co., 44 B.T.A. 88; Corn Exchange Bank, 6 B.T.A. 158; and Chatham & Phenix National Bank, 1 B.T.A. 460. Here the evidence shows that the book entries in question were not currently made, but were adjusting entries placed upon the books sometime after the close of the taxable years of the two corporations in connection with audits. The head of the auditing firm, who advised and assisted in all the transactions is dead, and the auditor who made the adjusting entries on the books of Southern was not called as a witness. On brief the petitioners state that the stock of Elliott "was actually issued to Southern." Clearly the record does not support the view that the stock was issued to Southern. It was originally issued in the names of the individuals and was pledged by them to Seaboard to secure their personal indemnity to Seaboard on construction bonds guaranteeing performance by Southern of construction contracts, including the construction by Southern for Elliott. Nor does the record sustain the view that the individuals transferred to Southern their ownership of stock of Elliott. It was not until *245 about August 22, 1951, that Seaboard relinquished the Elliott stock certificates. Neither the stock certificates nor the stock records of Elliott in any way indicate that Southern was the owner of the Elliott stock. And there is no evidence that the individuals in holding the stock of Elliott were acting for Southern. The petitioner testified that Seaboard was vitally interested in all transactions of the individuals and the two corporations and that its representative was consulted in connection with all matters. Seaboard undoubtedly would have been advised if there had ever been a transfer by the individuals to Southern of their pledged shares. Yet no representative of Seaboard was called as a witness. Nor did Zeigler, the majority stockholder of the two corporations, testify. On August 22, 1951, the petitioner and the other two individuals surrendered to Elliott their certificates of Elliott stock and Elliott then issued all the stock to Zeigler and Crowell. On the same date Southern received from Zeigler and Crowell their certificates of stock in Southern and these were canceled, leaving the petitioner as the sole stockholder of Southern. Thus, as late as August 22, 1951, the *246 individuals appear to have been treating the Elliott stock as owned by them individually. As indicated, the stock certificates themselves were not assigned by the individuals and turned over to Southern, they being in the hands of Seaboard. Nor is there any evidence of any written agreement transferring the stock itself to Southern. There were apparently no corporate minutes upon this subject - at least none were produced. The petitioner's testimony does not sustain the contention made that Southern owned the stock of Elliott and later distributed it out in redemption of the Southern stock owned by Zeigler and Crowell. He testified that he did not know who owned the stock of Elliott on August 22, 1951, but that he thought it was not owned by Southern. It is true that he stated that after the construction was completed and there was a balance owing to Southern from Elliott, Southern took over the project until paid. He did not state that the stock was transferred, and we construe his testimony to mean that Southern took charge of the project temporarily to protect itself. Crowell, who owned a very small percentage of the stock in each corporation, testified, in effect, that it *247 was understood at some time after the completion of the project in October 1950, and before the closing date of the records as of February 28, 1951, that the Elliott stock would go to Southern as an investment and that this happened sometime during that period, although recognizing that there was no actual transfer of the certificates since they were then held by Seaboard. However, he did not state how the stock was transferred, whether by contract or otherwise. If his testimony be construed as meaning that there was an oral contract which was sufficient to accomplish a transfer, we do not have testimony as to the precise details thereof. The petitioner, who owned a substantial interest in the corporation, did not testify as to any agreement. Crowell himself stated that his memory had been hazy, and we think his testimony falls far short of establishing that there was a transfer of the stock. The attorney for the two corporations testified, but he did not state that there had been, at or about February 28, 1951, a transfer of Elliott stock to Southern, or that at that time there was an agreement which would effect a transfer. After a careful consideration of the whole record, we *248 are constrained to the view that the petitioners have not shown that Southern became the owner of the Elliott stock, and that they have not shown error in the respondent's determination that Southern paid the petitioner's subscription price for the Elliott stock, resulting in the receipt by the petitioner of a dividend from Southern in the amount of $16,100. In view of our conclusion, it becomes unnecessary to consider an alternative dividend issue involving section 115(g), which respondent raised only in the event this Court should hold that Southern became the owner of the stock of Elliott and distributed it out on August 22, 1951 upon the surrender by Zeigler and Crowell to Southern of their stock in that corporation. The respondent determined additions to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939, [1] for failure to file declarations of estimated tax for the years 1950 and 1951. The petitioners allege that the respondent erred in determining these additions, contending that their failure to file was due to reasonable cause and not to wilful neglect. The petitioner testified that he relied completely upon the accounting firm which prepared his returns *249 and the corporate income tax returns and that he did not file declarations because that firm did not furnish him any proposed declarations to execute for those years. The petitioner does not claim that he was ignorant of the general requirement of section 58 of the Internal Revenue Code that individuals should each year file a declaration of estimated tax and pay currently the estimated tax due. This provision had been in the law since 1943 and the requirement was common knowledge. It cannot be assumed that the petitioner, who was an intelligent and successful business man, was not aware of this requirement. Indeed, there is affirmative evidence here that he was aware of it. A representative of the accounting firm testified that it was the policy of the firm in the case of each client to advise regarding the legal requirement and at the same time advise that the addition for failure to file was not being enforced by the representatives of the Bureau of Internal Revenue, and to leave to the client the decision as to whether or not to file. There is a duty upon individuals to comply with the law and they may not shirk their duty and avoid the legal consequences *250 of a failure to comply by merely throwing the burden upon an accounting firm and claiming that they did not file because the accounting firm did not prepare a declaration for them to file. As we stated in Ned Wayburn, 32 B.T.A. 813, 818, "The rendering of a proper return should be regarded by every citizen as a vital part of his life equally with that of attention to his business." This is not the type of case in which a taxpayer relies upon professional advice in a complicated and unusual situation justifying a conclusion that there was reasonable cause for failure to comply with the law. Cf. Reliance Factoring Corp., 15 T.C. 604. Here the petitioners, in the light of past experience, had reason to believe that they would have income sufficient to require the filing of declarations of estimated tax and we think it obvious that they advisedly refrained from filing merely because they thought the chances were good that the Bureau of Internal Revenue would not impose the addition. Under the circumstances, their failure to file declarations of estimated tax for each of the years 1950 and 1951 was due to wilful neglect and not due to reasonable cause within the *251 meaning of section 294(d)(1)(A). We hold that they are liable for proper additions to tax for failure to file declarations of estimated tax for the years 1950 and 1951. A. E. Hickman, 29 T.C. 864, and Coates v. Commissioner (C.A. 8), 234 Fed. (2d) 459, affirming a decision of this Court [14 TCM 1091; T.C. Memo. 1955-280]. The respondent also determined that the petitioners are liable for additions to tax under section 294(d)(2) *252 of the Internal Revenue Code of 1939, [2] for substantial underestimate of estimated tax. Reasonable cause is not involved in this issue. On this issue the petitioners request that we reverse our prior position and hold that in the case of a failure to file a declaration of estimated tax only one addition to tax is to be made, namely, that provided by section 294(d)(1)(A). They refer to Acker v. Commissioner (C.A. 6), 258 Fed. (2d) 568, certiorari granted - U.S. - (January 19, 1959), reversing a Memorandum Opinion of this Court [16 TCM 89; T.C. Memo. 1957-17]. However, we think our prior position is correct and we adhere thereto. G. E. Fuller, 20 T.C. 308, affirmed on other issues (C.A. 10), 213 Fed. (2d) 102; H. G. Irby, Jr., 30 T.C. 1166 (August 25, 1958); Patchen v. Commissioner (C.A. 5), 258 Fed. (2d) 544, affirming on this issue 27 T.C. 592; Hansen v. Commissioner (C.A. 9), 258 Fed. (2d) 585, affirming on this issue a Memorandum Opinion of this Court [16 TCM 471; T.C. Memo. 1957-113]; and Abbott v. Commissioner (C.A. 3), 258 Fed. (2d) 537, *253 affirming 28 T.C. 795. But cf. Acker v. Commissioner, supra.
The petitioners argue that the imposition of the *254 addition to tax under section 294(d)(2) for the year 1950 is not justified because of the fact that their joint return for the year 1949 showed no tax due. They refer to section 29.294-1(b) of Regulations 111 and claim that under those regulations no addition to tax for underestimation would be incurred where the declaration is based upon the preceding year's income. They point to the fact that it has been held that in the case of failure to file a declaration, the estimated tax is considered as zero ( G. E. Fuller, supra) and contend, therefore, that the failure to file is equivalent to filing a declaration showing an estimated tax of zero, and that therefore their situation comes within the regulations. We do not agree. The regulations, [3] as well as section 294(d)(2) itself, contemplate the actual filing of a declaration as a prerequisite to the special relief provided in the case of estimates made on the basis of the prior year's return. We hold that the petitioners are liable for proper additions to tax under section 294(d)(2) for the years 1950 and 1951. *255 Decision will be entered under Rule 50. Footnotes
1. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file declaration. - In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid.↩
2. Section 294(d)(2) provides in part: (2) Substantial underestimate of estimated tax. - If 80 per centum of the tax * * * exceeds the estimated tax * * * there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by which such tax so determined exceeds the estimated tax * * *, whichever is the lesser. This paragraph shall not apply to the taxable year in which falls the death of the taxpayer, nor, under regulations prescribed by the Commissioner with the approval of the Secretary, shall it apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter * * * of such year * * * in an amount at least as great as though computed (under such regulations) on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of the filing of the declaration for such taxable year * * * but otherwise on the basis of the facts shown on his return for the preceding taxable year. * * * [Italics Supplied.]↩
3. Regs. 111, section 29.294-1(b)(3), as amended by T.D. 5403, 1944 C.B. 349, provides in part as follows: Section 294(d)(2) provides for an addition to the tax in the case of a taxpayer who makes a substantial underestimate of tax on his declaration. * * * * * *
In the event of a failure to file the required declaration, the amount of the estimated tax for purposes of this provision is zero. * * *
The addition to the tax for substantial underestimate of the estimated tax shall not apply to the taxable year in which the taxpayer makes a timely payment of estimated tax within or before each quarter of such year in an amount at least as great as though such estimated tax were computed under the law applicable to the taxable year on the basis of the taxpayer's status with respect to the personal exemption and credit for dependents on the date of filing the declaration, or on July 1 where the 15th day of the third month of the taxable year occurs after July 1, and on the basis of the tax withheld, and reasonably expected on the date of the filing of the declaration to be withheld, on wages received during the calendar year ending with or within the taxable year, but otherwise as though such estimated tax were computed on the basis of the normal tax net income, the surtax net income, and the victory tax net income, shown on the taxpayer's return for the preceding taxable year, adjusted to conform to the law applicable to the taxable year. * * *↩