WELSH HOMES, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69035. Filed April 29, 1959.

*Mason G. Kassel, Esq.*, and *Harry J. Rudick, Esq.*, for the petitioner.

*Paul E. Waring, Esq.*, and *George J. Rabil, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year | Deficiency |
|---|---|
| 1952 | $48, 007. 88 |
| 1953 | 44, 831. 86 |
| 1954 | 86, 395. 11 |
| | 179, 234. 85 |

Petitioner claims that overpayments of tax had been made for the taxable years 1952 and 1953 in the respective amounts of $308,462.08 and $75,000.

The issues raised by the pleadings are: (1) Whether the capitalized value of ground rents created or reserved by petitioner during the taxable years involved is includible in petitioner's gross income for such years in the absence of sale or redemption during such years; (2) alternatively, in the event we hold that the capitalized value of the ground rents does not constitute part of the amounts received by petitioner, then, whether the total amounts received by petitioner (but without offset to cost of construction except through depreciation) constitutes rental income with respect to each of the properties in

question. This second issue was raised by respondent in an amended answer filed 1 week prior to the start of the trial in this case. The amended answer sets forth claims for increased deficiencies which respondent requests us to find in the event he is sustained on the alternative issue. The total [1] deficiencies claimed by respondent in his amended answer are as follows:

| Year | Deficiency |
|------|-----------|
| 1952 | $3, 528, 003. 86 |
| 1953 | 2, 205, 297. 04 |
| 1954 | 1, 243, 405. 43 |
| | 6, 976, 706. 33 |

FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, is incorporated herein by this reference.

The petitioner is a corporation organized under the laws of the State of Maryland on March 26, 1946. Its principal place of business is 11 East Fayette Street, Baltimore, Maryland. The returns for the taxable years here involved were filed by petitioner with the district director of internal revenue at Baltimore, Maryland. During each of the taxable years involved, petitioner kept its books and filed its Federal tax returns on a calendar year basis.

During the calendar years 1952, 1953, and 1954, the business activity of petitioner consisted of the acquisition of land, the construction of houses thereon, and the sale [2] of such houses, subject to annual ground rents. In constructing and selling its houses, petitioner would first acquire land in fee simple which had been either subdivided into lots at the time of acquisition or which petitioner would subdivide into lots. Petitioner would then have house plans drawn and erect several different types of exhibition houses for each development, and would advertise the properties for sale subject to an annual ground rent. The purchaser then contracted to buy the lot improved by a house to be erected or one that was being erected at a particular location which he might choose, conforming generally to whatever exhibition house he might select but with such changes or additions as he might desire and agree to pay for.

The procedure followed by petitioner with respect to the sale of its houses subject to annual ground rents was as follows:

---

[1] The increased deficiency claimed by respondent for the year 1953 includes a claimed increase in taxable income of $8,640. This claimed increase results from the failure of respondent to include the capitalized value of 10 ground rents, each with a capitalized value of $1,600, in the computations as set forth in the statutory notice of deficiency.

[2] As used in this opinion, the terms "sale" and "conveyance" of a house or home are terms of convenience and are not to be construed as legal conclusions relative to the exact estates created as noted *infra*.

(a) When a purchaser decided to buy a particular lot improved by house to be constructed or being erected at a designated location, a downpayment or deposit was given to the salesman selling the house. At that time, an agent's report would be prepared by the salesman and signed and accepted by petitioner. The agent's report would set forth the purchase price of the property subject to an annual ground rent, the amount of the annual ground rent, the name of the purchaser, the amount of the deposit, and the location of the particular property. The agent's report would then be sent to petitioner's central office.

(b) Petitioner's central office would then prepare a formal contract setting forth the names of the purchasers, the purchase price, the annual ground rent, the location of the property, the type of house, the method of financing, and the balance of the downpayment to be made by the purchasers. This contract of sale would then be executed by the purchasers and petitioner.

(c) A résumé of the contract was then forwarded by petitioner's central office to its superintendent on the particular job. The résumé contained the type of house, the location, and any specific change from the form of the exhibition house. The superintendent then proceeded according to the résumé.

(d) At or about the time of the completion of the construction of the house, petitioner, as lessor, would enter into a lease with a straw corporation as lessee covering the lot and the improvements thereon for a term of 99 years, renewable forever, subject to the specified annual ground rent.

(e) During the period of time between the signing of the contract and the completion of the house, the purchaser would arrange for financing the purchase price of the house, usually by borrowing the major portion of such purchase price from an outside third party. At the settlement date the purchaser would come to petitioner's central office and a settlement sheet would be prepared. The purchaser would pay the proceeds of sale to petitioner, as set forth in the contract of sale, and would receive a deed of assignment from the straw corporation.

During the period of construction, petitioner carried a blanket builder's risk policy insuring the house for its benefit but said insurance was canceled as of the date of settlement with respect to the particular house. At that date, new policies were taken out by the home purchasers and none of the insurance proceeds on said policies were payable to petitioner. Petitioner did not require any of the home purchasers to insure the houses sold to them and had no interest in any policies taken out by the home purchasers.

The documents executed in connection with the sale by petitioner of its houses subject to annual ground rents are illustrated by those pertaining to premises situated at 1008 Harwall Road, which are typical of all the documents executed by petitioner during the taxable years with respect to the sale of its houses subject to ground rents involved in this proceeding.

The agent's report with respect to the house located at 1008 Harwall Road was dated March 9, 1953, and provided as follows:

Received of Harlan W. Hooe, Jr., and Frances X. Hooe, his wife, $100 as deposit on account of purchase of 1008 Harwall Road at and for the price of $11,250. Subject to an annual ground rent of $96. * * * This sale subject to written approval of Welsh Construction Company Agent.

The contract of sale was entered into on April 16, 1953, between the Welsh Construction Company as agent for petitioner, seller, and Harlan W. Hooe, Jr., and Frances X. Hooe, his wife, purchaser, and provided for the sale of the lot and 2-story brick dwelling then being erected thereon known as 1008 Harwall Road for a purchase price of $11,250, subject to an annual ground rent of $96. Pertinent portions of this typical contract of sale are as follows:

This Agreement, Made this 16th day of April, 1953, between The Welsh Construction Company (a Md. corporation), Agent, Seller, of the first part, and Harlan W. Hooe, Jr., & Frances X. Hooe, his wife, Purchaser, of the second part, witnesseth:

, Seller agrees to sell to purchaser and the latter agrees to purchase from the former the following described property in Baltimore County, Maryland: Being the 2-story brick dwelling now being erected on lot known as No. 1008 Harwall Road subject to an annual ground rent of $96.00.

Upon and subject however to the following agreements, provisions and conditions: The purchase price is to be Eleven Thousand Two Hundred Fifty ($11,250.00) Dollars of which $100.00 have been paid prior to the signing hereof and the balance is to be paid as follows: $600.00 upon the execution hereof; $100.00 in cash on May 15, 1953; $100.00 in cash on June 15, 1953; $100.00 in cash on July 15, 1953; balance in cash on date of settlement.

Settlement is to be made within fifteen (15) days after seller notifies purchaser that house is completed.

     *       *       *       *       *       *       *

And upon settlement being made and upon payment of the unpaid balance of the purchase money as aforesaid a deed shall be executed by seller at expense of purchaser which shall convey the property by good and merchantable title, subject however, to substantially the same restrictions as are imposed on restrictive convenants of record.

Taxes, Ground Rent and Metropolitan District Charges (on a yearly basis the same as taxes) to be adjusted as of date of settlement.

Possession of property will not be given until settlement is made.

Witness the signature of Seller by its duly authorized agent and witness also the hands and seals of purchaser.

An agreement covering the lot and improvements thereon at 1008 Harwall Road creating an annual ground rent of $96 was executed on October 15, 1953, by petitioner, as lessor, and its straw corporation, the East Realty Company, as lessee. Said agreement provided in part as follows:

Witnesseth, That the said Lessor, in consideration of the rents hereinafter expressed to be paid, does lease unto the said Lessee, its successors and assigns, all those [here appears a legal description of six lots of ground of which No. 1008 Harwall Road was one].

\* \* \* \* \* \* \*

Together with the improvements thereon and the rights and appurtenances thereto belonging or appertaining.

To Have and to Hold the said lots of ground unto and to the use of the said Lessee, its successors and assigns, for the term of ninety-nine years beginning on the date of the date of these presents, it, the said Lessee, its successors or assigns, yielding and paying therefor unto the said Lessor, its successors or assigns the rent or yearly sum of Ninety-Six Dollars ($96.00) on each of the lots of ground hereinabove described in each and every year during the continuance of this demise and that in even and equal half-yearly installments accounting for the same from the 15th day of October, nineteen hundred and fifty-three, over and above all deductions for taxes and assessments of every kind levied or assessed or to be levied or assessed, on said demised premises or the rents issuing therefrom and that in such manner as that each one of the aforesaid lots of ground shall be liable only for its own rent.

Provided that if any one or more of said rents shall be in arrear, in whole or in part, at any time, then it shall be lawful for said Lessor, its successors or assigns, to make distress therefor upon the premises so in arrear.

And Provided also, that if any one or more of said rents shall be in arrear in whole or in part, for sixty days, then it shall be lawful for the said Lessor, its successors or assigns, to re-enter upon the premises so in arrear and hold the same until all arrearage of rent and all expenses incurred by reason of such non-payment shall be fully paid.

And Provided Further, that if any one or more of said rents, in whole or in part, shall be in arrear for six months, then the said Lessor, its successors or assigns, may re-enter upon the premises so in arrear and hold the same as if this lease had never been made.

And the said Lessee, for itself, its successors and assigns, covenants with the said Lessor, its successors and assigns, to pay the aforesaid rents, taxes and assessments when legally demandable.

And the said Lessor, for itself, its successors and assigns, covenants with the said Lessee, its successors and assigns, that on the payment by it or them of said rents and performance of all covenants herein on the part of the said Lessee, its successors and assigns, to be performed, it, the said Lessor, its successors or assigns, will warrant the property hereby leased against all persons claiming or to claim anything therein, by, through, or under them or any of them, and that at any time during this demise the said Lessor, its successors or assigns, shall on payment to it or them of One Dollar as renewal fine, execute and deliver to the said Lessee, its successors or assigns, at its or their request and cost of a new lease for each one of the above-demised lots of ground, which shall not be forfeited for non-payment of the rent thereof as

hereinbefore expressed, for another term of ninety-nine years, to commence on the expiration of this lease, subject to the same rent and with the same covenants, so that the demise hereby created may be renewable and renewed as to such lot or lots respectively from time to time forever.

On November 30, 1953, which was the settlement date with respect to the property located at 1008 Harwall Road, petitioner caused its straw corporation, the East Realty Company, to assign to Harlan W. Hooe, Jr., and his wife, the leasehold interest in the property described in the contract of sale upon which the house had then been completed. Said deed of assignment, which was dated November 30, 1953, provided in part as follows:

This Deed, Made this 30th day of November, in the year one thousand nine hundred and fifty-three by and between The East Realty Company, a body corporate, duly incorporated under the Laws of the State of Maryland, of the first part, and Harlan W. Hooe, Jr. and Frances X. Hooe, his wife, of Baltimore County, in the State of Maryland, of the second part.

Witnesseth, That in consideration of the sum of Five Dollars ($5.00) and other good and valuable considerations, the receipt whereof is hereby acknowledged, the said The East Realty Company does grant and convey unto the said Harlan W. Hooe, Jr. and Frances X. Hooe, his wife, as tenants by the entireties, their assigns, the survivor of them, and the survivor's personal representatives and assigns all that lot or parcel of ground situate in Baltimore County aforesaid, and described as follows, that is to say: [Here appears a legal description of the property.]

Being the same lot of ground fifthly described which by Lease dated October 15, 1953 and recorded among the Land Records of Baltimore County in Liber G.L.B. No. 2374 folio 507, was leased and demised by Welsh Homes, Incorporated unto the said The East Realty Company.

    *       *       *       *       *       *       *

Together with the buildings thereupon, and the rights, alleys, ways, waters, privileges, appurtenances and advantages thereto belonging, or in any wise appertaining.

To Have and to Hold the said described lot of ground and premises, unto and to the use of the said Harlan W. Hooe, Jr. and Frances X. Hooe, his wife, as tenants by the entireties, their assigns, the survivor of them, and the survivor's personal representatives and assigns, for all the residue of the term of years yet to come and unexpired therein, with the benefit of renewal forever; subject to the payment of the annual rent of Ninety-Six Dollars payable half-yearly on the fifteenth days of April and October in each and every year.

And the said party of the first part hereby covenants that it has not done or suffered to be done any act, matter or thing whatsoever, to encumber the property hereby conveyed that it will warrant specially the property hereby granted; and that it will execute such further assurances of the same as may be requisite.

Between the date of the signing of the contract of sale and the date of settlement stated therein, the purchasers arranged for the financing of the property described therein, subject to the annual ground rent, by borrowing the major portion of the stated amount from a financial institution secured by a mortgage on the land described therein, "To-

gether with all buildings and improvements now and hereafter on said land." At the settlement date, Harlan W. Hooe, Jr., secured a fire insurance policy in the amount of $10,000, issued in his name and that of his wife, covering the dwelling at 1008 Harwall Road. This policy was endorsed to cover the interest of the Monumental Life Insurance Company as mortgagee. Petitioner had no interest in said company or said insurance policy. At the time of settlement, petitioner received the balance of the stated price for the property which was subject to the annual ground rent retained by petitioner. The memorandum of settlement provides in part as follows:

Welsh Homes, Incorporated—Seller.
Harlan W. Hooe Jr. and Frances X. Hooe, his wife—Purchasers—Mortgagors.
Eastern State Building & Loan Association, Incorporated—Mortgagee.
Property No. 1008 Harwall Road—Adjustment as of November 30, 1953.

| | | |
|---|---:|---:|
| Purchase Price | | $11,250.00 |
| 1953 Taxes 11/30/53–12/31/53 waived | | |
| | | |
| | | $11,250.00 |
| *Less:* | | |
| Payment on Account | $1,000.00 | |
| G.R. ($96.00) 10/15/53—11/30/53 | 12.00 | 1,012.00 |
| | | |
| Due Seller—Account Settlement | | $10,238.00 |
| *Settlement Expenses:* | | |
| Attorney's Fee in connection with Mortgage | $110.00 | |
| Notary Fee | | |
| Recording Deed and Mortgage | 17.00 | |
| V.A. Compliance Inspection Fee | 15.00 | |
| Credit Report | 2.00 | |
| ½ State and Federal Revenue Stamps | 12.65 | 156.65 |
| | | |
| Service Charge | | 100.00 |
| Fire & Extended Coverage Insurance (10,000—1 year) | | 23.00 |
| Interest 11/30/53 | | 1.25 |
| *Deposit to Credit of Expense Account:* | | |
| Toward six months Ground Rent due 4/15/54 | $24.00 | |
| Toward 1954 Taxes | 80.50 | |
| Toward Fire & Extended Coverage Insurance Renewal | 1.90 | 106.40 |
| | | |
| | | $10,625.30 |
| V.A. Mortgage to Eastern State Building & Loan Association, Incorporated | | 10,000.00 |
| | | |
| Due by Mortgagors | | $625.30 |

The figure of $11,250 as shown on the memorandum of settlement represents the selling price of the property subject to an annual ground rent.

The item of $12 on the memorandum represents an adjustment of ground rent as provided for in the contract and is the amount of the ground rent due and payable between the time the ground rent was created and the date of settlement.

The item of $23 captioned "Fire and Extended Coverage Insurance" represents the first year's fire insurance premium on the house which was taken out by the Hooes.

It is possible to insure the interest of the ground rent owner, i.e., the reversionary interest, but during the taxable years and thereafter, petitioner did not carry policies of insurance on any of the ground rents involved in this proceeding. If petitioner had attempted to insure the reversionary interest retained by it, its insurance coverage would have been limited to the value of the ground rents, capitalized at 6 per cent, and petitioner would not have been able to procure insurance on the value of the houses conveyed to the home purchasers. With respect to all of the houses conveyed by petitioner during the taxable years which were subject to annual ground rents, the only amounts received by petitioner were the amounts called for in contracts of sale of the houses, and no portion of the selling price was attributed by petitioner to the land.

Although the contracts of sale did not so provide, under Maryland law the home purchaser could, after 5 years from the date of the lease, relieve himself of the obligation of paying the annual ground rent and could acquire a fee simple title to the property by redeeming the ground rent and paying the petitioner, or its assigns, an amount equal to the annual ground rent, capitalized at 6 per cent. The home purchaser, however, was under no obligation and could not be compelled to redeem the ground rent at any time. Upon the redemption of the ground rent, petitioner would convey and grant to the home purchaser, his heirs and assigns, an absolute fee simple title to the property. Typical of such a deed is the deed to the assigns of Harlan W. Hooe, Jr., and Frances X. Hooe, his wife, by petitioner, executed on September 22, 1958, the pertinent provisions of which provide:

This Deed, Made this 22nd day of September, in the year one thousand nine hundred and fifty-eight, by and between Welsh Homes, Incorporated a body corporate of the State of Maryland, of the first part, Grantor, and Albert H. Plitt, of Baltimore County, State of Maryland, of the second part, Grantee.

Witnesseth: that in consideration of the sum of Five Dollars, and other valuable considerations, the receipt whereof is hereby acknowledged, the said Grantor does hereby grant and convey unto the said Grantee, his heirs and assigns, in fee simple, all that lot(s) of ground situate in the First District of Baltimore County, in the State of Maryland, and described as follows, that it is to say: [Here appears a legal description of the property.]

The leasehold interest in said property was acquired by the party—of the second part by Deed of Assignment dated December 2, 1955 and recorded among

the aforesaid Land Records in Liber G. L. B. No. 2833, folio 124, from Harlan W. Hooe, Jr. and wife.

Together with the buildings and improvements thereupon; and the rights, alleys, ways, waters, privileges, appurtenances and advantages to the same belonging or in anywise appertaining; the reversion therein and especially the clear, separate annual ground rent issuing and payable thereout, as aforesaid.

To have and to hold the said described lot(s) of ground and premises, unto and to the use of the said Albert H. Plitt, his heirs and assigns, in fee simple, to the end and intent that the leasehold estate may be merged in the fee and the aforesaid annual ground rent be forever extinguished.

And the said Grantor covenants that it will warrant specially the property hereby granted and conveyed, and that it will execute such further assurances of said land as may be requisite.

As a result of the above transactions, when a ground rent is created in Maryland, the lessee (purchaser) buys a leasehold interest and a privilege to buy in the reversion at the end of 5 years from the date of the creation of the lease. The lessor (seller) has sold a leasehold interest but retains a reversionary interest, which interest is retained until such time as it is redeemed, sold or otherwise disposed of.

During the calendar years 1952, 1953, and 1954, petitioner followed the above-noted procedures with respect to 505, 372, and 251 houses, respectively. Said houses had an aggregate cost to petitioner of $5,035,956.29, $3,566,779.60, and $2,649,120.25, respectively. The annual ground rents reserved by creating said ground rents involved in this case aggregated $47,202, $34,212, and $23,766, and the aggregate cost of the land to petitioner during the calendar years 1952, 1953, and 1954 amounted to $378,829.62, $151,218.71, and $127,-335.54, respectively. The capitalized value of the ground rent created in each of the above years, capitalized at 6 per cent, amounted to $786,700, $570,200, and $396,100, respectively. Petitioner received an aggregate payment of $5,668,826.74, $3,750,856.11, and $2,801,517.97 during the taxable years 1952, 1953, and 1954, respectively, with respect to the transactions involved in the instant case.

Ground rents are salable in and about the city of Baltimore, and it would have been possible for petitioner, during the taxable years involved, to have sold the ground rents involved in this case for their capitalized value, capitalized at 6 per cent. During the taxable years 1952, 1953, and 1954, petitioner did not sell, transfer, or otherwise dispose of any of its reversionary interests or rights to receive the annual ground rent with respect to any ground rents created during said years, and none of said ground rents were redeemed by any of the home purchasers.

During the taxable years 1957 and 1958, 57 and 47, respectively, of said reversionary interests were redeemed. During the year 1954, two ground rents were redeemed which were ground rents created prior to 1952, both of which were at least 5 years old at the date of

their redemption. During the years 1952 and 1953, there were no redemptions of ground rents which were created prior to 1952.

The ground rent system is, and has been for many years, the conventional method utilized by home builders in the Baltimore area, since the financing of property is made easier in that it requires a smaller downpayment and smaller monthly payments.

In accounting for the gain on transactions realized on the above type of transactions during each of the taxable years 1946 to 1952, inclusive, petitioner first took the cost of the house, to which it added the cost of the land and the cost of doing business, and after totaling these three items, which it subtracted from the sum of the amount received, plus the capitalized value of the ground rent, it arrived at the profit realized, which profit was reported on its respective income tax returns filed for each of those years and paid the tax on the profits so reported.

In computing its taxable income for the taxable year 1952, petitioner included in its gross income with respect to the transactions referred to above, the amount of $632,870.45, which represented the difference between the selling price of the houses, namely, $5,668,-826.74, and the cost of construction of the houses, namely, $5,035,-956.29, and also included the amount of $407,870.38, which represented the difference between the value of the annual ground rents, capitalized at 6 per cent, namely, $786,700, and the cost of the lots upon which the houses sold were constructed, namely, $378,829.62.

Although in its Federal income tax returns filed prior to 1953, petitioner had included in its gross income the difference between the value of the annual ground rents, capitalized at 6 per cent, and the cost of lots on which the houses were constructed, petitioner excluded such difference from its gross income in its 1953 and 1954 income tax returns. Petitioner changed its method of accounting for the ground rents upon the advice of tax counsel, which counsel relied upon the decision in *Morris Lipsitz*, 21 T.C. 917 (1954), affirmed on another issue 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955). Petitioner's tax counsel advised that unless the capitalized value of the ground rent was excluded from gross income in 1953 and 1954, petitioner might have to pay tax on the same gain twice.

On November 7, 1955, petitioner filed with the appropriate district director of internal revenue a claim for refund for the calendar year 1952 in the amount of $222,475.04, which represented the tax attributable to the amount included in its gross income representing the difference between the value of the annual ground rents, capitalized at 6 per cent, and the cost of lots on which the houses were constructed, together with interest thereon. Said refund claim was timely filed.

On June 14, 1954, petitioner filed its return of income for the year 1953 showing a net operating loss of $159,235.26. In said return, petitioner included in its gross income with respect to its real estate transactions, the amount of $184,076.51, which represented the difference between the selling price of the houses, namely, $3,750,856.11, and the cost of the construction of the houses, namely, $3,566,779.60, but excluded the amount of $418,981.29, representing the difference between the value of the annual ground rents, capitalized at 6 per cent, namely, $570,200, and the cost of the lots on which the houses were constructed, namely, $151,218.71.

On November 7, 1955, petitioner filed with the appropriate district director of internal revenue an additional claim for refund of Federal income tax for the calendar year 1952 in the amount of $85,987.04, plus interest, which claim was based on the net operating loss for the year 1953 which it desired to carry back to the year 1952. On March 15, 1954, petitioner requested an automatic extension of time to file its 1953 income tax return, and on the same date paid to the appropriate authorities an amount of $75,000 on account of its estimated tax liability. In its final return for the year 1953, filed on June 14, 1954, which showed a net operating loss of $159,235.26, and by letter dated June 14, 1954, petitioner claimed a refund due of said $75,000, but that amount has not been refunded to petitioner. The refund claim was timely filed.

Petitioner's income tax return for the year 1954 indicated a net operating loss of $88,903.49. In said return, petitioner included in its gross income with respect to its real estate transactions, the amount of $152,397.72, representing the difference between the selling price of the houses, namely, $2,801,517.97, and the cost of construction of the houses, namely, $2,649,120.25, but excluded the amount of $268,764.46, representing the difference between the value of the annual ground rents, capitalized at 6 per cent, namely, $396,100, and the cost of the lots on which these houses were constructed, namely, $127,335.54. Thereafter, petitioner filed with the appropriate district director of internal revenue an application for a tentative carryback adjustment of $88,903.49 to the year 1952, and claimed an overpayment of income tax on its 1952 return of $48,007.88. This amount was refunded to petitioner on or about December 9, 1955, and was taken into account by respondent in determining the deficiency for the taxable year 1952.

Through the above series of transactions, prior to redemption of the ground rent, the purchaser becomes the owner of a leasehold interest and is entitled to hold the premises so long as he pays the stated, annual ground rent. The seller is the owner of a reversionary interest in the premises. Until such time as the reversionary interest

is redeemed, sold, or otherwise disposed of, there is no taxable event upon which gain or loss of that interest can be determined in relation to such reversionary interest.

The proceeds received by petitioner from the sale of leasehold interests are not rent.

## OPINION.

### *Issue 1.*

The first issue is whether petitioner realized a taxable gain, not only on the purchase price of the leasehold interest at the time of its sale, but also a taxable gain on a reversionary interest which was not sold or disposed of at that time, measured by capitalizing the annual ground rent at 6 per cent.

In *Estate of Ralph W. Simmers*, 23 T.C. 869 (1955), affd. 231 F. 2d 909 (C.A. 4, 1956), this issue was answered in the negative.

The parties are in substantial agreement that the facts in *Simmers, supra,* and the instant case are on all fours.[3]  In the instant case, petitioner, a Maryland corporation, was engaged during the taxable years involved in the business of constructing and selling houses in the Baltimore area subject to an annual ground rent.  This procedure has been for many years a conventional and traditional method of selling houses in and around Baltimore.

Stripped to essentials, the following illustrates the transactions involved in both *Simmers* and the instant case:

1. Unimproved land was acquired by petitioner in fee simple.

2. The contract between petitioner and purchaser for the sale of a lot to be improved by a house, subject to an annual ground rent, was executed.

3. Commencement of construction.

4. The grant of a 99-year lease, renewable forever, on each lot and improvements thereon to a straw corporation, controlled by petitioner.  The agreement reserves to the lessor (petitioner) an annual ground rent of 6 per cent of the capitalized (stated) value of the ground rent.  This results in the creation of what is known as a Maryland ground rent.

5. Upon completion of the house, the purchaser makes full payment for the leasehold, usually financed in large part by taking out a mortgage, and receives an assignment deed from the straw corporation, which deed conveys a leasehold interest in the lot and improvements thereon, subject to the annual ground rent.

---

[3] Respondent, however, is somewhat ambivalent on this point; while admitting that the facts in both cases are practically the same, he calls our attention to the stipulation of facts in *Simmers* in which he notes that it was stipulated that the houses were sold. Respondent contends that this fact limited our decision and that of the Court of Appeals to the narrow issue of whether the land, as distinguished from the house, was sold or leased.  Our reading of the stipulation and findings of fact made by this Court, and relied upon by the Court of Appeals, does not support respondent's position.

Under Maryland statutory law, the lessee (purchaser) could, after 5 years from the date of the creation of the lease, relieve himself of the obligation of paying the annual ground rent and could acquire a fee simple title to the property by redeeming the ground rent and paying petitioner an amount equal to the annual ground rent capitalized at 6 per cent. The purchaser, however, was under no obligation and could not be compelled to redeem the ground rent.

Respondent's position in the instant case and in *Simmers, supra*, is essentially the same, i.e., that the reserved ground rent is to be treated as a mortgage and that the capitalized value thereof should be included in determining gain or loss resulting from such a sale.

As to this point, the Court of Appeals, in *Simmers, supra*, said (at 915):

While the economic relation between lessor and lessee resembles that of mortgagor and mortgagee, there is the important difference that the purchaser can never be compelled to pay the so-called mortgage debt. Ordinarily, a vendor-mortgagee receives something of value in exchange for the transfer of the land, that is, the obligation of the vendee-mortgagor, which in Maryland is usually in the form of a note, to pay a definite sum at a fixed time in the future. But the vendor in the ground rent system holds no such obligation and can recover the principal sum only by the voluntary redemption of the rent by the vendee or a sale of the rent to a third party. The difference is vital because there is no realization of taxable gain until one or the other of these events occurs.

This Court stated in *Simmers* (at 877):

Where the factual situation of the transactions involved warranted, Maryland ground rental arrangements variously have been held to be security for the unpaid portion of the purchase price of land, *Bosley et al.* v. *Bosley's Executrix*, 14 How. 390, or security for the repayment of a loan or of other indebtedness, *Montague* v. *Sewell*, 57 Md. 407, *Posner Brothers* v. *Bayless, Trustee*, 59 Md. 56. Likewise, in *Pennsylvania Co. For Insurances on Lives, Etc.*, 19 B.T.A. 699, affd. 52 F. 2d 601, a certain Pennsylvania ground rental arrangement was regarded as security for the unpaid portion of the purchase price of real estate. In *Morris Lipsitz*, 21 T.C. 917 (on appeal, C.A. 4), the Maryland ground rental arrangements there involved were held to be leases. The decision in each instance was reached on the basis of the particular facts presented. Despite the suggestion, contained in certain arguments advanced here, as to the desirability of such a rule, there appears to be no uniform rule, or authority therefor, which classifies all ground rental arrangements as leases, or classifies all of them as mortgages, or classifies them as something else. The character of any given arrangement must be determined on the basis of the facts relating thereto.

It is clear from the above language that we did not believe the factual situation in *Simmers* warranted a finding that the ground rent arrangement was a security for the unpaid portion of the purchase price, hence, the equivalent of a mortgage. The similarity between the *Simmers* case and the case at bar prevents any such present finding and we have made none.

The cases cited by respondent in support of his position involve factual situations which support a finding that the ground rent was

security for a loan transaction and were fully considered and distinguished by this Court and the Court of Appeals in *Simmers, supra.*

Respondent, quite candidly, admits that *Simmers* is directly contra to his position, but contends that the Court of Appeals and this Court erred in reaching the conclusion that until the reversionary interest held by the lessor is sold, redeemed, or otherwise disposed of, there is no taxable event upon which gain or loss can be determined.

Respondent asks us to reexamine *Simmers,* looking toward a contrary conclusion in the instant case. We have made a careful analysis and appraisal of both fact and law in the instant case and have reviewed our opinion in *Simmers.* We adhere to our views and those expressed in the opinion of the Court of Appeals.

## Issue 2.

During the taxable years involved, petitioner conveyed 1128 houses, constructed at an aggregate cost of $11,251,855, for a total selling price of $12,221,199. The difference between the aggregate cost and selling price was $969,344, which was reported as income in petitioner's tax returns. Respondent, under his alternative theory, has treated the full amount received from the purchaser, less depreciation, as taxable income to petitioner on the theory that it is rent. Respondent, on brief, states the issue as follows:

It is respondent's affirmative position as set forth in the amended answer that a lease of the entire property, both the house and lot, was affected under the ground rent arrangement. The question presented under this affirmative issue is whether the transaction, whereby an occupant receives a house and lot for money, mortgages, and a ground rent lease and where the builder receives money and a right to receive certain ground rent payments, constitutes a sale or other disposition of the entire property, or whether it constitutes a lease of the entire property. It is submitted that the transaction is not divisible into two transactions. It is in substance a sale or a lease. It cannot be both.

The position of respondent is predicated on certain language in both our opinion and the Court of Appeals' opinion in *Simmers, supra.* Respondent notes that we stated, at 23 T.C. 879: "In our opinion, the ground rental arrangements were no more than leases." Respondent notes that the Court of Appeals, Fourth Circuit, in *Simmers,* stated (at 914), "that the relationship between the owner of the ground rent and the owner of the leasehold is historically and actually that of lessor and lessee."

Respondent argues that if *Simmers* was correctly decided, then there was a lease of both the land and the house and that the total amounts received, less depreciation, are rental income without a deduction for costs applicable in constructing the houses.

Petitioner, on the other hand, contends that the transactions are divisible and that the purchaser owns the house but leases the land.

He supports his view with the following language of the Court of Appeals in *Simmers*, p. 911: "In common parlance, the purchaser owns the house and builder the land."

In our opinion, both parties have, to some extent, misunderstood and misconstrued the holding in *Simmers*.

Upon the creation of the ground rent, there are two interests in the property; the reversion, owned by the grantor, and the leasehold, owned by the purchaser. *Ogle* v. *Reynolds*, 75 Md. 145, 23 Atl. 137 (1891); *Moran* v. *Hammersla*, 188 Md. 378, 52 A. 2d 727 (1947); *Kolker* v. *Biggs*, 203 Md. 137, 99 A. 2d 743 (1953). The purchaser has, in reality, a dual standing; he is the owner of the leasehold interest in the property and he is the lessee of the reversionary interest. The grantor is the owner of the fee and the lessor of the reversionary interest.

When the purchaser receives his deed of assignment from the straw corporation, he has paid for the leasehold interest, but he has not purchased the reversion. As to the reversionary interest, he is the lessee, and as such pays the agreed annual ground rent. "When a ground rent is created, the lessee buys a leasehold and a privilege to buy in the reversion at the end of five years from the date of the creation of the lease." Kaufman, "The Maryland Ground Rent—Mysterious But Beneficial," 5 Md. L. Rev. 1, 48, 49 (1940).

In *Simmers, supra*, we held that the original owner in fee simple could create a leasehold interest and convey that interest while still retaining his reversion. When he sold or conveyed the leasehold, he did not sell or convey the reversionary interest.

In essence, *Simmers* held that the builder could not be taxed on his reversionary interest until it is disposed of either by sale or redemption. Respondent can tax him on the sale of the leasehold interest which was sold, and, to the extent that what he received was in excess of the cost properly attributable to the leasehold, he has taxable gain. Not having sold or disposed of the reversionary interest, there is no taxable event relative to that interest.

Respondent takes the position that he would be fully satisfied if we were to reverse our position in *Simmers, supra*, even though the resulting tax deficiency would be in the approximate amount of only $179,234.85. He argues, in the alternative, that if we adhere to *Simmers* (as we have done), the necessary result is that we must find that the entire purchase price of the leasehold interest must be taken to be rent; that (except for annual depreciation) the cost of the improvements may not be taken into account; and that the resulting tax deficiency will be approximately $6,976,706.33.

The lack of confidence of respondent in his alternative proposal is both obvious and understandable. From the perspective of both

the economic viewpoint and that of the practical administration and application of the income tax laws, the approach is fantastic, and, in our opinion, wholly without merit.

Facing the realities, through procedures well known and long established in Maryland, petitioner has created a number of leasehold interests retaining reversionary interests or so-called "ground rents" with respect to the several properties involved. Acquisition of a leasehold interest is conditioned upon, or subject to, the reversionary interest or ground rent. The retention of the leasehold is predicated upon the payment of the annual ground rent. The arrangement, on the basis of which the ground rent is payable to the builder, is a lease, and the amount of ground rent paid is, in fact, paid as rent.

The leasehold interest, however, is an interest that is separate and distinct from the reversion, and may be the subject of purchase, sale, or assignment. *Oscar L. Thomas*, 31 T.C. 1009 (1959); 1 Tiffany, "Real Property" (1939) sec. 118; Mayer, "Ground Rents in Maryland" (1883), pp. 62, 66, 67. The purchase or sale price is not rent in any sense of the word because it has to do with the acquisition or disposition of an entirely separate interest subject only to the reversion.

The proceeds of the disposition of the leasehold interest, therefore, are to be accounted for, from a tax perspective, in the same manner as the sale of any other interest in property and not as rent. Correspondingly, in determining gain, petitioner is entitled to offset, as part of its cost, the cost of the improvements properly attributable to the respective leasehold interests sold or assigned.

*Decision will be entered under Rule 50.*