Vernon W. McPherson and Carolyn M. McPherson v. Commissioner.
McPherson v. Commissioner
Docket No. 79784.
United States Tax Court
T.C. Memo 1962-106; 1962 Tax Ct. Memo LEXIS 203; 21 T.C.M. (CCH) 583; T.C.M. (RIA) 62106; May 1, 1962
Richard W. Case, Esq., 300 St. Paul Place, Baltimore, Md., and George Edward Thomsen, Esq., for the petitioners. William L. Kinzer, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioners' income tax for the year 1954 in the amount of $32,407.92. The main issue is whether the gain realized by petitioners upon dissolution of their corporation is to be considered as gain from the sale or exchange of property which is not a capital asset, as provided in section 341, Internal Revenue Code of 1954. [1] Another issue is presented involving the correct amount of gain petitioners realized upon the dissolution *204 of the corporation. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Petitioners are husband and wife and they reside in Baltimore, Maryland. They filed their joint income tax return for the taxable year 1954 with the district director of internal revenue at Baltimore, Maryland. Vernon W. McPherson has been in the real estate business since 1939. The business consisted of selling all kinds of houses and occasionally he sold new houses for builders. In 1953 he decided to go into the building business and in about June of that year he negotiated for the purchase of a 62-acre tract of land located on the west side of York Road near Towson, Baltimore County, Maryland. As the result of these negotiations McPherson, on October 10, 1953, signed a contract to purchase the above described tract of land containing approximately 62 acres for the sum of $86,279.20, or approximately $1,400 per acre. A preliminary statement should be made with respect to acreage areas. There is confusion in the record because of the use of fractions, or such terms as "approximately" *205 or "more-or-less" - sometimes the entire area is referred to as 62 1/2 acres by one party and 62 acres by the other. Other parts of this area, which, as will be seen later, must receive separate mention, are given different acreage areas (differing by as much as 1 to 2 acres) by the parties. We do not understand that any issue depends on exact acreage so we will omit fractions and qualifying phrases and use the acreage figures that seem to identify parcels. Prior to McPherson signing the contract to purchase the above property he had engaged the services of Bernard Willemain, who was a Site Planner, for the principal purpose of ascertaining how many lots could be made out of the tract so that he would know about how much he could pay for the tract. Willemain made up a lot plan and he recommended that an engineering firm, Whitman, Requardt and Associates, be engaged to prepare a topographic map of the entire tract, principally to see how many of the proposed lots would or could be served with existing sewer lines. It was based upon reports received from Willemain and Whitman, Requardt and Associates that McPherson entered into the contract to purchase the 62-acre tract and at the *206 time of the execution of the contract he made a down payment of $8,500. On October 26, 1953, McPherson caused the formation of two corporations. One was The Carolyn Company, in which he was issued 90 percent of the stock and his wife was issued 10 percent of the stock for a total of $8,000 cash. The other was Carolyn Homes, Inc., in which he, his wife, and Robert L. Purdy were each issued one-third of the stock. On March 23, 1954 settlement was made for the 62-acre tract by deed to The Carolyn Company and a purchase money mortgage signed by Carolyn Company and guaranteed by Vernon W. McPherson in the amount of $56,000. The mortgage only covered 47 acres in the northern part of the 62-acre tract. On March 30, 1954, The Carolyn Company deeded the 15 acres not encumbered by the mortgage to Carolyn Homes, Inc. McPherson's plan for the development of the tract was to have Carolyn Homes, Inc. begin its development first on its 15-acre tract by building houses on the lots which were to be laid out on a final plat to be recorded with Baltimore County and thereafter have Carolyn Company start its development. Since Purdy was a one-third owner of Carolyn Homes, Inc., separate financing *207 would be required. Pursuant to this plan carolyn Homes, Inc., in order to obtain working capital, on March 30, 1954, borrowed $24,960 on a mortgage on its 15 acres, which yielded a net of $23,285.94. The working capital was inadequate due to erroneous estimates of costs and overhead expenses and failure to take into consideration advancements necessary for cost of installing utilities. After construction had started on the first lots in the 15-acre tract McPherson learned utilities costing in the neighborhood of $40,000 would be required and that Baltimore County would not allow the installation of the utilities and payment at the time of sale of the completed houses; that payment had to be deposited with the county before beginning the work of installing the utilities. Construction mortgages covering certain lots which financed the buildings on the lots would not be available to finance the prepayment of utility costs. McPherson was without quick assets on which he could borrow the sum needed to continue Carolyn Homes, Inc. development. In May or early June 1954 the decision was made to raise the needed money by dissolving Carolyn Company and put the 47 acres back in the names *208 of McPherson and his wife and sell a part of the 47 acres to raise the needed money. Some time in early June, McPherson was offered $2,000 an acre by The Edmondale Building Company for 37 acres of the 47-acre tract, which offer was refused. On July 6, 1954 the directors of Carolyn Company voted to dissolve the corporation. In July of 1954 McPherson again entered into negotiations with a broker representing The Edmondale Building Company. This company was developing a tract of land lying to the west of the 62-acre tract called Orchard Hills. The Edmondale Building Company was anxious to secure a portion of The Carolyn Company's tract lying adjacent to its Orchard Hills development. Some 20 acres of the land which had been in its Orchard Hills development had been taken for school purposes. The Carolyn Company's land would give the Orchard Hills development an access to York Road, which was a more valuable vehicle access than the one it had to the west of its Orchard Hills development. As the result of further negotiations, McPherson entered into a contract on July 29, 1954 wherein he agreed to sell The Edmondale Building Company 37 acres of the 47 acres The Carolyn Company owned *209 for the sum of $113,965.62, or approximately $3,125 per acre. On September 3, 1954 the articles of dissolution of The Carolyn Company were received by the State Tax Commission of Maryland. On September 22, 1954, the 47-acre tract was deeded by The Carolyn Company to the two stockholders, Vernon W. McPherson and Carolyn M. McPherson. On November 23, 1954 settlement was made between the petitioners and The Edmondale Building Company and the 37 acres were conveyed by petitioners to The Edmondale Building Company for the full amount of $113,965.62. On their joint individual income tax return for the taxable year 1954, petitioners reported the amount of $77,550 as a long-term capital gain realized upon the exchange of their stock in dissolution of The Carolyn Company. The reported gain was computed as follows: Gross Sales Price (Net Equity in Assets
Distributed)
$85,550
Less Cost Basis
8,000
Gain
$77,550
In his notice of deficiency the respondent determined the fair market value of petitioners' net equity in the assets received upon liquidation of The Carolyn Company was $95,250 instead of $85,550, as reported. Accordingly, respondent determined the gain realized *210 upon liquidation of The Carolyn Company was $87,250 instead of $77,550, as reported. Respondent also determined that The Carolyn Company was a collapsible corporation, as defined in section 341(b) and therefore the gain was taxable as ordinary income. The Carolyn Company was not formed or availed of principally for the construction of property, with a view to a distribution to petitioners, prior to the realization by The Carolyn Company of a substantial part of the net income to be derived from the property. Opinion The first issue is whether the gain upon the distribution of Carolyn Company's assets to its two stockholders is taxable to them as ordinary income, as determined by respondent, or as capital gain, as reported by petitioners. The parties admit the issue will be determined by deciding whether Carolyn Company was a "collapsible corporation", as defined in section 341(b), Internal Revenue Code of 1954. [2]
*211 Respondent's position is that the requisite view: that Carolyn was formed or availed of with a view to a distribution to stockholders by liquidation before realization of a substantial part of its income to be derived from its property, existed at the time the company was formed or the land purchased, or thereafter the requisite view existed during construction. We think it was established that at the time Carolyn Company was formed and the land acquired, the incorporators entertained no thought of its liquidation prior to its realization of a substantial part of income from the property acquired. The corporation was formed and the property acquired for the purpose of subdividing the land into lots, building houses thereon, and selling them to the public. Nothing in the record would indicate that at the time the company was formed and the land acquired McPherson contemplated an early liquidation prior to the company realizing the potential income that prompted him to form the company and cause it to buy the property. The purchase price was based upon surveys as to the number of building lots that the tract contained and everything indicates that at the time the company was formed *212 and the land obtained, the intent of McPherson, who dictated the policy of the corporation, was to have it enter the building business on the land it acquired. McPherson testified that the intent to liquidate first came when he was pressed for funds to carry on building activities that had been started by Carolyn Homes, Inc. on its property. Other evidence corroborates his testimony. We hold the requisite view did not exist at the time The Carolyn Company was formed and the land acquired. Carolyn Company was, as indicated above, and, to use the words of the statute, "formed * * * principally for * * * construction." (Sec. 341 (b)(1)). Respondent admits that if the requisite view did not exist at the time the corporation was formed and its land asset acquired, it would have to exist "during construction" in order to make Carolyn Company a collapsible corporation within the statutory definition. See also section 1.341-2(a)(3), Income Tax Regs. Thus we have here a corporation that was formed for construction but it could not be availed of for construction with a view to a distribution to its stockholders by early liquidation if no construction occurred before *213 liquidation. We hold no construction in fact ever occurred prior to liquidation. At the time the corporation was liquidated its land asset was in the same condition as when it was purchased. It was a tract of rural realty covered by second growth timber and nothing was physically done to the land during the life of Carolyn Company. Respondent argues construction within the meaning of the statute occurred by virtue of preliminary steps with respect to surveys and platting the area. The most that the record shows in this regard is that McPherson, before he executed the contract to buy the 62 acres in October of 1953, hired Willemain to make a plat layout to show him what he could expect to do with the land and give him an idea of how much he could pay for it. Willemain, who was not an engineer, recommended hiring Whitman, Requardt and Associates, who made a topography survey, which showed approximately how many lots would be serviced by present sewer lines. McPherson testified he paid Willemain $600 and Whitman, Requardt and Associates $3,000 for the plat layout and survey. The two items appear as preincorporation expenses on the books of Carolyn Company as of March 23, 1954, the *214 date Carolyn Company acquired the 62 acres. A survey map, prepared by Whitman, Requardt and Associates, and bearing date "November 27, 1953 Revised February 24, 1954" was introduced in evidence. Witnesses refer to this as a "tentative plat." It shows the entire area of 62 acres but it is not a plat in the sense of portraying accurate lots, and dedicated highways. There was some testimony that the map of Whitman, Requardt and Associates or one like it was filed with Baltimore County, but witnesses testified the filing of such a map, called a tentative plat, would give the landowner no right to improve and develop the property; that nothing short of a recorded plat showing lot and road layouts would or could be approved for construction and development. Witnesses for petitioner testified the filing of this tentative plat was required by the county authorities. We find nothing in the Maryland statutes to that effect. However, it is clear that the map of Whitman, Requardt and Associates would not qualify for recording as a plat under Art. 17, § 60, Annotated Code of Maryland. [3] There was testimony that a final plat was recorded for the 15 acres titled to Carolyn Homes, Inc. but petitioners' *215 evidence is that no final plat was ever recorded for the 47 acres by Carolyn Company. One was filed later by Edmondale (who made no use of the tentative plat filed by petitioner) on the 36 acres it purchased. We do not believe the filing of this tentative plat can be called a step in construction. Respondent relies upon J. D. Abbott, 28 T.C. 795, affirmed 258 F. 2d 537. The case is readily distinguishable. There the corporation had, prior to liquidation, actually subdivided the property, dedicated streets, secured approval of the municipality of its plans, constructed streets, installed utilities, and secured financing through FHA commitments. We held such activities constituted "construction" in the statutory sense. Here none of the things, which were held to be part of construction in *216 the Abbott case, were done prior to liquidation. We conclude on the record presented that construction had not commenced on the property by Carolyn Company prior to its dissolution. This means that the requisite view did not exist; that Carolyn Company was not availed of for construction with the view to liquidation prior to the realization of a substantial part of its income; and that Carolyn Company was not a collapsible corporation within the statutory definition. In view of the above, we do not reach the argument presented by petitioner that the tract of land in issue was not a section 341 asset because The Carolyn Company did not intend to sell the land, but only intended to sell the houses that it would construct thereon and retain the entire interest in the land. [4]
There seems to be an issue remaining with respect to the amount of gain petitioners realized upon the liquidation of Carolyn Company, though petitioners make no argument on brief that respondent's determination that the gain was $87,250 was incorrect. Respondent's determination is based *217 upon stipulated figures of $8,000 paid by petitioners for their stock for which they received land subject to a mortgage on which there was then due $55,100 which they assumed. There is a dispute as to the fair market value of the 47 acres at the time of liquidation. Respondent used a fair market value of $150,350 (approximately $3,100 an acre for 48.5 acres) value for the land, making the gain $87,250. Petitioner requested a finding of fact that "the fair market value of the land contracted for to any developer other than Edmondale was $2,000.00 per acre." The witness who handled the Edmondale purchase gave that as his expert opinion. Petitioner introduced no evidence of the fair market value of the land at the time of dissolution. Respondent's valuation is supported by the sale to Edmondale at about the time of the dissolution at $3,125 an acre. There is evidence that Edmondale might pay a premium for the land but respondent is entitled to the judgment on this issue because of petitioners' complete failure to sustain their burden. We hold for respondent on the issue that petitioners realized a gain of $87,250 upon the liquidation distribution, which, because of our holding that *218 Carolyn Company was not a collapsible corporation, was reportable as capital gain. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 341. COLLAPSIBLE CORPORATIONS. * * *
(b) Definitions. - (1) Collapsible Corporation. - For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to - (A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and (B) the realization by such shareholders of gain attributable to such property. (2) Production or Purchase of Property. - For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if - (A) it engaged in the manufacture, construction, or production of such property to any extent. (B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or (C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation. * * *↩
3. The requirements prescribed by the cited statute are many, starting with the requirement: "[such] plats must be drawn accurately to scale * * *" and ending with the requirement that it contain the owner's certificate that statutory requirements have been complied with. We refrain from setting forth the long statute since neither party bases any argument thereon.↩
4. This involves the Maryland ground rent system, which is explained in Welsh Homes, Inc., 32 T.C. 239↩.