J. D. ABBOTT AND KATHRYN ABBOTT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CARL M. WOLFE AND MARY E. WOLFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 52617, 52618. Filed June 28, 1957.

*Harry Friedman, Esq.*, and *Jerome C. Bachrach, Esq.*, for the petitioners.

*Albert J. O'Connor, Esq.*, for the respondent.

800

802

OPINION.

Opper, *Judge:* If this controversy dealt with the liability of the seller of real property to pay tax on ordinary income rather than capital gain, the problem would be comparatively simple. The resulting profit would be ordinary "net income." See *Spanish Trail Land Co.*, 10 T. C. 430; *Brown* v. *Commissioner*, (C. A. 5) 143 F. 2d 468, affirming a Memorandum Opinion of this Court; *Gamble* v. *Commissioner*, (C. A. 5) 242 F. 2d 586, affirming T. C. Memo. 1955–289.

Petitioners themselves concede, indeed they insist, that "the record is clear that Leland Corporation was formed for the purchase, subdivision and sale of land to customers in the regular course of business." It is even possible that if the only question concerned the gain to the corporation from the sale of property previously owned by it but distributed in liquidation to its stockholders, the result might, under different circumstances, be to attribute the gain to the corporation which owned the property during the negotiations. See *Rose Kaufmann*, 11 T. C. 483, affd. (C. A. 3) 175 F. 2d 28.

But the effect of what was done here is said to be that only the petitioners were in receipt of any gain and that their profit is taxable only as capital gain. This is for the reason that the corporation was not the seller of the property and had no income on which to pay any tax; and that since it had no earnings and profits, and since the dis-

tribution to petitioners was in liquidation, their income was only capital gain. And when they, as individuals, came to sell the property and thus realize the "net income" to the creation of which all of the activities of the corporation had been devoted, the increase over their own new basis was so small that only a token profit accrued. It would seem at first glance that this is precisely the kind of situation to which section 117 (m) was directed.[1] And it is the applicability of that section which is the present issue; that is whether petitioners, the individuals who owned the stock of the corporation, received taxable ordinary income by virtue of the characterization of the corporation as "collapsible."[2] See *Raymond G. Burge*, 28 T. C. 246.

The controversy arises against the following factual background:

Petitioners, the only stockholders, contracted, while their corporation still owned the property, with two builders to "cause" the conveyance of part of the corporation's land to the builders. They further agreed to cause the installation of streets, sewers, and other improvements. Petitioner Abbott was to arrange F. H. A. mortgage financing. The two builders paid their purchase price into escrow pending F. H. A. approval, the funds then to continue to be held and to be used to pay for the improvements. The corporation contracted with the municipality to have the improvements installed, to provide for payment for them, and to dedicate the land needed therefor in return for recording the development plan and obtaining the approval of the municipality. Petitioners liquidated the corporation and received the land. They thereupon deeded to buyers a number of parcels, including the land contracted for, which had in the meantime been covered by F. H. A. commitments, and provided for the improvements, for which they made payments from the funds in escrow.

---

[1] Upon completion * * * but prior to the realization by the corporation of any income therefrom, the corporation is liquidated and the assets are distributed. In such a case, the corporation pays no tax, claiming that it has realized no income. The producer pays tax upon the difference between his cost and the fair market value of the assets so distributed; but such gain is reported as long-term capital gain * * *. After liquidation * * * [i]f the income * * * does not exceed such fair market value, there is no further tax. [H. Rept. No. 2319, 81st Cong., 2d Sess., p. 57; 1950–2 C. B. 380, 423.]

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

   (m) COLLAPSIBLE CORPORATIONS.—

      *        *        *        *        *        *        *

   (2) DEFINITIONS.—

     (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

        (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

        (ii) the realization by such shareholders of gain attributable to such property.

     (B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, or produced property, if—

        (i) it engaged in the manufacture, construction, or production of such property to any extent,

Petitioners, of course, contend that the activities of the corporation (or of the shareholders in dealing with the property of the corporation) which were responsible for the increase in value and the consequent profit on resale, are not encompassed within any of the purposes to which section 117 (m) refers.[3] Specifically, they say that Leland was not engaged in construction in the first place and, in the second, that the increase in the value of property was the result of the securing of F. H. A. commitments and nothing else.

But we think it would be idle to suggest that subdivision of the property, installation of streets and utilities, obtaining the approval of the municipality, and securing financing through F. H. A. commitments would not ordinarily be the preliminary part of construction—that is, the early steps in transforming the raw land into completed apartments. Indeed, it may be said that construction of a road is no less "construction" than building an apartment house. And construction need not consist of the activities involved from start to completion. There is no requirement that to be collapsible a corporation must carry the construction through from the beginning to the end of the project. Quite the contrary. That the term "construction" was intended to have its broadest scope is demonstrated by the accompanying phrase "to any extent." If there were doubt of this, the contemporary committee reports would dispel it:

> Subparagraph (B) of paragraph (2) of the subsection states that a corporation shall be deemed to have * * * constructed * * * property if it engaged in the * * * construction * * * of such property to any extent * * *. Under this statement the corporation need not have originated the * * * construction * * *; *neither need the * * * construction * * * be completed by it.* It will nonetheless be deemed to have * * * constructed * * * property in that *its shareholders may realize gain with respect to the additional value added to the property by the * * * construction * * ** to the extent that it was carried out. [H. Rept. No. 2319, 81st Cong., 2d Sess., p. 98; 1950–2 C. B. 450. Emphasis added.]

See also S. Rept. No. 2375, 81st Cong., 2d Sess., p. 89; 1950–2 C. B. 547.

Nor does it alter the situation that the F. H. A. commitments, whether or not by themselves they would be "construction," were obtained through petitioners or their agencies. Without them, there might have been no occasion for subdivision and development of the land by the corporation. But without ownership of the land, the commitments would have been meaningless. All the activity was interconnected and

---

[3] One of petitioners' contentions is that the extension of the definition of a collapsible corporation to include corporations which purchased property normally sold to customers in the ordinary course of their business, and which was not made until 1951, indicates that they are not included in the 1950 version of the section. But section 326, Revenue Act of 1951, which made the change, expressly states:

(c) EFFECTIVE DATE.—* * * The determination of the tax treatment of gains realized prior to September 1, 1951, shall be made as if this section had not been enacted and without inferences drawn from the fact that the amendments to section 117 (m) made by this section are not expressly made applicable to gains realized prior to September 1, 1951, and without inferences drawn from the limitations contained in section 117 (m), as amended by this section.

cannot be considered separately. Particularly the rise in value of the land while it was owned by the corporation cannot be so narrowly attributed to a single element that the corporate ownership and activity are completely discounted.

Neither is it significant that the streets and other improvements installed by the corporation, by petitioners, or by agencies employed by them, occupied a part of the land that, instead of being received as a distribution, was dedicated to the municipality. It is clear that the increase in the value of the remaining land was due at least in part to these improvements, and entirely to them and the other activities, including the F. H. A. commitments with which they were indivisibly connected. The gain in the last analysis must be said to be "attributable to the property * * * constructed" for without the improvements there could have been no F. H. A. commitments, and without the latter, even on petitioners' theory, there would have been no gain. That general situation is covered by respondent's regulations which certainly cannot be considered unreasonable in the circumstances:

Gain may be attributable to the property referred to in section 117 (m) (2) (A) even though such gain is represented by an appreciation in the value of the property other than that manufactured, constructed, produced, or purchased. Where, for example, a corporation owns a tract of land and the development of one-half of the tract increases the value of the other half, the gain attributable to the developed half of the tract includes the increase in the value of the other half. [Regs. 111, sec. 29.117–11 (c) (3).]

Petitioners strenuously contend that the corporation was not "availed of" "with a view to" eliminating ordinary income or permitting the stockholders to realize gain with reduced tax liability. They insist that liquidation of the corporation had been decided on before the transactions giving rise to the principal profit. The difficulty is that for a number of reasons the record does not support these contentions.

There is, to be sure, some evidence that by reason of the insistence of the prior stockholders, procedures were undertaken looking toward liquidation. But after that Abbott became the majority stockholder, and we have found as a fact, at petitioners' request, that from that time on the corporation's activities resulted from his decisions. There is no evidence that he intended to liquidate the corporation or to distribute its property to the stockholders any sooner than this was actually done. Parenthetically it seems highly improbable that any earlier liquidation would ever have taken place if Abbott's was the decisive vote. The gain reported by petitioners on the distribution to them in exchange for their stock was set up as long-term capital gain in view of the fact that by that time Abbott had held his stock for more than 6 months, although barely so. Such treatment would have been hazardous if the distribution had taken place sooner than it did and less than 6 months after his stock acquisition. See, e. g., *Helvering* v.

*Weaver Co.*, 305 U. S. 293. But be that as it may, we are unable to find that the intention, if any, formulated when a totally different group was in control of the corporation, is in any way indicative of the purposes or views of the corporation or its stockholders when other minds fixed its objectives and the reason for the original decision had disappeared.

By the same token it is impossible to discern any business reason for liquidation of the corporation except the supposed saving of taxes. Arrangements for sale of part of the property were already well under way; there is no business reason why they **could** not have been completed while the corporation remained the owner. A good proportion of the remaining property ultimately found its way into the hands of other corporations owned by petitioners. No reason appears why it could not equally well have remained the property of the original corporation. If, however, the distribution of the property to petitioners, their consummation of the previously negotiated arrangements for development and sale, and their collection of the proceeds as capital gain and without profit to the corporation, are effective tax devices, a potent reason—and the only one apparent on this record—easily appears for the way things were done.

There is some suggestion that because the improvements were actually installed, at least in part, after the distribution to petitioners, they are not to be considered to any extent as attributable to the intervention of the corporation. But the facts show that not only was the genesis of the improvements the agreements made while the corporation owned the property and that they were a prerequisite to the securing of the ultimate purchasers but that, in fact, the funds needed to defray the cost of installation were first derived from the purchasers, placed in escrow as a result of the original agreements, and finally used to discharge an obligation of the corporation undertaken for the very improvements specified in the contract of sale; so that the entire operation was arranged for and covered by binding agreements made at a time when, as owner of the property, only the corporation itself was in a position to, and actually did, carry the transaction forward.[4]

That petitioners, as the sole stockholders of the corporation, felt themselves in a position to make the agreements as individuals, knowing that their controlled corporation could be counted upon to take whatever subsequent action their commitments called for, is merely a further reason why the provisions of section 117 (m) must necessarily be invoked. If it were otherwise, and if individuals could thus project the acts which would take place after distribution and dissolution

---

[4] This is what we assume petitioners mean when they say in their brief: "Leland was a party to the agreement with Baldwin [the township] only because it was the record holder of the title and obviously *the only party then in a legal position to enter into the agreement with the Township.*" Emphasis added.

as though the corporation was in no sense a participant, all of the provisions in question would be meaningless. As we said in *Raymond G. Burge, supra* (p. 262) :

It is also clear that any gain to the shareholders may be considered as gain attributable to the property constructed, even though the *corporation* has not realized gain from such property. Indeed the statute basically contemplates the sale or exchange of stock or a distribution by the corporation prior to the realization by the corporation of a substantial part of the net income to be derived from the property. * * *

Finally, petitioners contend on the same theory that, on the one hand, a substantial part of the total profit had already been realized by the corporation as its "net income" [5] and, on the other, that less than the requisite 70 per cent of the total amount involved was attributable to "the property * * * constructed." [6] Both contentions derive from the assumption that only the property actually sold by the corporation can be regarded as giving rise to the income from the transaction; and that the F. H. A. commitments, the subdivision and street improvement work, and the sale of the property, actually carried out subsequent to dissolution but as a result of commitments made prior to it, are to be attributed only to petitioners and not in any respect to corporate activity. In this position, as we have said, we are unable to concur.

It may be appropriate to add that although the corporation may not have been "formed" for the purposes described, it was manifestly "availed of" for whatever was actually accomplished. Under the statute that is sufficient.

Our conclusion is that petitioners have not borne their burden, cf. *Thomas Wilson*, 25 T. C. 1058, *W. H. Weaver*, 25 T. C. 1067, 1084, of showing that the corporation was not availed of principally for the purpose of constructing property with a view to a distribution to its shareholders prior to the realization by the corporation of a substantial part of the net income on such property, and that, accordingly, respondent's determination must be sustained.

As to the addition to tax imposed on petitioners Wolfe for failure to file declarations under section 294 (d) (1) (A), and for substantial underestimation of tax under section 294 (d) (2), it suffices to say that the record is inadequate for a finding that any reliance on a qualified and informed accountant was "reasonable cause" for the failure to

---

[5] See sec. 117 (m) (2) (A) (i), footnote 2, *supra*.

[6] SEC. 117. CAPITAL GAINS AND LOSSES.

  (m) COLLAPSIBLE CORPORATIONS.—

    *        *        *        *        *        *

    (3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

    *        *        *        *        *        *

      (B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced ; and

file any declaration, *Rene R. Bouche*, 18 T. C. 144, *Walter H. Kaltreider*, 28 T. C. 121; and that it is now established, as petitioners recognize, that the imposition of this addition to tax does not preclude the further addition for substantial underestimation of tax. *G. E. Fuller*, 20 T. C. 308, affd. (C. A. 10) 213 F. 2d 102; *Harry Hartley*, 23 T. C. 353; *Fred N. Acker*, 26 T. C. 107. See also *H. R. Smith*, 20 T. C. 663.

Reviewed by the Court.

*Decisions will be entered for the respondent.*