J. D. ABBOTT and Kathryn Abbott,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Carl M. WOLFE and Mary E. Wolfe,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

Nos. 12439, 12440.

United States Court of Appeals
Third Circuit.

Argued April 15, 1958.

Decided July 31, 1958.

538

Harry Friedman, Washington, D. C. (Jerome C. Bachrach, Pittsburgh, Pa., on the brief), for petitioners.

Thomas N. Chambers, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

Two issues are presented by these consolidated petitions to review decisions of the Tax Court. The primary issue is whether the gain realized by taxpayers on the liquidation of their corporation is capital gain, or ordinary income under the "collapsible corporation" provisions of Section 117(m) of the Internal Revenue Code of 1939, as amended, 26 U.S.C. § 117(m). A secondary issue poses the question of whether the penalty under Section 294(d) (2) for substantial underestimation of tax may be assessed in addition to the penalty under Section 294 (d) (1) (A) for failure to file a declaration of estimated tax.

In these cases the respondent Commissioner determined deficiencies in petitioners' income tax and additions for the year 1950, as follows:

| | Deficiencies | Additions to Tax | |
| --- | --- | --- | --- |
| | | § 294(d)(1)(A) | § 294(d)(2) |
| J. D. Abbott and Kathryn Abbott | $57,031.00 | —— | —— |
| Carl M. Wolfe and Mary E. Wolfe | 12,175.26 | $1,923.19 | $1,153.91 |

The Tax Court sustained the respondent's deficiency determinations, finding that petitioners' corporation was a "collapsible" corporation within the purview of Section 117(m) of the Code, and also sustained the imposition of both additions to petitioner Wolfe's tax. 1957, 28 T.C. 795. This decision was reviewed by the full Tax Court.

In late August, 1948, petitioner Wolfe and three others organized the Leland Corporation for the stated objectives of buying, selling, mortgaging, and otherwise managing improved and unimproved land, and generally the carrying on of a building and construction business. Wolfe owned 20% of the stock of Leland. Petitioner Abbott was a named incorporator, but not an original shareholder.

Abbott was engaged in a mortgage business carried on through two corporations.

Leland Corporation acquired a little more than one hundred acres of land in four purchases from September, 1948, to March, 1950. The total of the purchase price was $75,409.55, slightly more than $752 an acre. In May, 1949, Leland, considering the development of part of its land for single family residences, contracted for the installation of streets and sewers in its Plan No. 1.

Leland's Plan No. 2 provided for apartment sites and comprised 15.82 acres. This tract was sold in late October, 1949, at a gain of $23,472.75.

On November 19, 1949, Abbott acquired 75% of Leland's stock and there-

after became its controlling influence. Wolfe owned the remaining 25%.

The events which followed were recounted in the findings of the Tax Court:

"On February 15, 1950, petitioners contracted with Catarinella to sell 3 plots of land to erect apartment buildings. Petitioners agreed to 'cause' the land to be conveyed to Catarinella. Petitioners further agreed to 'cause' installation of streets, sewers, and utilities, as shown on the plan, within 1 year after an F.H.A. insurance commitment was obtained. The buyer agreed to furnish to Abbott's corporation all required information and material for F.H.A. mortgage insurance applications. The parties agreed that the purchase price should be immediately paid into escrow pending F.H.A. approval, after which the fund would be so held to pay for street and sewer improvements. Petitioners agreed to contract for the construction of these improvements within 60 days after F.H.A. approval was obtained. The parties conditioned the agreement on F.H.A. approval of these sites and the agreement recited that petitioners contemplated that all land in the plan would be similarly developed for apartments through F.H.A. financing.

"On February 15, 1950, petitioners contracted with a group headed by Young to sell 2 plots. The terms and provisions of this agreement conformed to those of the agreement with Catarinella.

"Young and Catarinella deposited $64,350 and $80,300, respectively, with Potter Title and Trust Company, hereafter referred to as the trust company, to be held in escrow as provided in the agreements of February 15, 1950.

"On February 21, 1950, Leland purchased 3.356 acres of land from the Baldwin School District needed to complete the plot which petition-ers had agreed to sell to Catarinella 6 days previously. Leland had previously owned the remainder of the land.

"On March 6, 1950, Leland purchased 4.010 acres of land from Schwotzer. Petitioners ultimately deeded this land on July 10, 1950.

"On May 8, 1950, Leland and the township entered an agreement whereby Leland, in consideration of the approval of 'Leland Heights Plan No. 3' for recording purposes, agreed to construct the streets, sewers, and improvements shown on the entire plan according to the rules and regulations of the township. Leland further agreed to deposit $120,000 in escrow with the trust company for the completion of these improvements. Simultaneously, Leland executed a bond guaranteeing performance of its contract with the township. Petitioners signed these agreements as officers of Leland. On May 10, 1950, the trust company notified the township and the F.H.A. that it held in escrow more than $120,000 to be used for street and sewer improvements in Plan No. 3 under the contract between Leland and the township. That fund consisted of the moneys previously deposited by Young and Catarinella under the agreements with petitioners."

On May 13, 1950, before the sale of the land under the February contracts had been consummated, Leland's two stockholders voted to dissolve the corporation. They received in liquidation 84.438 acres of land, which included the land in Plan No. 3. The gain realized by Abbott through the increased market value of the land was $143,907.34; Wolfe realized a gain of $47,969.11. The gain on the liquidation of Leland was reported by the taxpayers as a long-term capital gain.

After part of the land had been conveyed to petitioners individually, they contracted in their individual capacities for the installation of streets, storm

sewers, and sanitary sewers, pursuant to their several agreements. Improvements made by petitioners between May 29, 1950, and December 31, 1950, totaled $145,967.02. Most of the money in escrow was used to finance these improvements.

In several other separate transactions, taxpayers sold 35 acres of the land covered by F.H.A. commitments for a total price of $435,350. They received an average of $8,800 an acre for the land approved for F.H.A. financing or dedicated to public use. The increase in the land's value reflected the improvements made.

The Commissioner treated the gain to petitioners on liquidation of Leland as ordinary income within the "collapsible corporation" provisions of Section 117 (m). That section was added to the Code of 1939 to prevent the use of the corporate facade for the conversion of ordinary income into capital gain, and reads in part as follows:

"(m) Collapsible corporations.

"(1) Treatment of gain to shareholders. Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3),[1] be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions.

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing or purchasing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property.

"(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

"(i) it engaged in the manufacture, construction, or production of such property to any extent, * * *"

In sustaining the Commissioner's position that Leland was a "collapsible corporation," the Tax Court found that:

I. Paragraph (3) provides:

"(3) Limitations on application of subsection.

"In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

"(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, or at the time of the purchase of the property described in subsection (a) (1) (A) or at any time thereafter, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

"(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; and

"(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, production, or purchase." 26 U.S.C. § 117(m) (3).

"When Leland distributed the land to petitioners, it had not realized a substantial part of the net income to be derived from the property.

"Leland was formed or availed of principally for the manufacture, construction, or production of property, with a view to (1) a distribution to petitioners, prior to the realization by Leland of a substantial part of the net income to be derived from the property; and (2) the realization by petitioners of the gain attributable to the property."

These findings are vigorously controverted by petitioners.

 The tax avoidance device at which the "collapsible corporation" provisions of Section 117(m) were aimed operates as follows: The taxpayer organizes or makes use of a corporation to create the appearance of long-term capital gain in what is really ordinary income—gain derived from a venture in manufacture, production, or construction of property. Prior to a realization by the corporation of a substantial part of the income to be derived from the property constructed, the corporation is liquidated or "collapsed." The taxpayer then pays the tax on the difference between the cost of the property and the fair market value on distribution, and this amount is entered as long-term capital gain and taxed accordingly at the capital gain rate. The taxpayer then treats as ordinary income only the amount finally realized in excess of the stepped-up basis of the fair market value resulting from the liquidation. See Burge v. Commissioner of Internal Revenue, 4 Cir., 1958, 253 F.2d 765, H.Rep. No. 2319, 81st Cong., 2d Sess. p. 57 (1950–2 Cum.Bull. 422, 423). The Tax Court held that this was precisely what the petitioners here did, and we think it was right in its determination.

One of the principal contentions of petitioners is that the statute requires the construction to be done by the corporation, whereas here much of the construction enhancing the value of the land was done by petitioners after liquidation. The Tax Court's reasoned opinion adequately answers this contention, and we quote from it at some length:

"There is some suggestion that because the improvements were actually installed, at least in part, after the distribution to petitioners, they are not to be considered to any extent as attributable to the intervention of the corporation. But the facts show that not only was the genesis of the improvements the agreements made while the corporation owned the property and that they were a prerequisite to the securing of the ultimate purchasers but that, in fact, the funds needed to defray the cost of installation were first derived from the purchasers, placed in escrow as a result of the original agreements, and finally used to discharge an obligation of the corporation undertaken for the very improvements specified in the contract of sale; so that the entire operation was arranged for and covered by binding agreements made at a time when, as owner of the property, only the corporation itself was in a position to, and actually did, carry the transaction forward.

"That petitioners, as the sole stockholders of the corporation, felt themselves in a position to make the agreements as individuals, knowing that their controlled corporation could be counted upon to take whatever subsequent action their commitments called for, is merely a further reason why the provisions of section 117(m) must necessarily be invoked. If it were otherwise, and if individuals could thus project the acts which would take place after distribution and dissolution as though the corporation was in no sense a participant, all of the provisions in question would be meaningless. * * *" 1957, 28 T.C. 795.

Section 117(m) was added to the 1939 Code in 1950, so that it applies to all of the relevant transactions of petitioners.

The petitioners argue, however, that the 1951 amendment applying to the purchase of property held "primarily for sale to customers in the ordinary course of his trade or business" was an extension of Section 117(m) and demonstrated that Congress did not intend such transactions to be covered by the 1950 amendment. This argument is adequately answered by the 1951 enactment itself, which states as follows:

"(c) Effective Date.—* * * The determination of the tax treatment of gains realized prior to September 1, 1951, shall be made as if this section had not been enacted and without inferences drawn from the fact that the amendments to section 117(m) made by this section are not expressly made applicable to gains realized prior to September 1, 1951, and without inferences drawn from the limitations contained in section 117(m), as amended by this section." Revenue Act, 1951, § 326 (c), 26 U.S.C.A. § 117 note.

Petitioners make a final contention that Leland was not a collapsible corporation because it had already realized a "substantial part" of the net income to be derived from the property. The corporation realized $23,472.75 profit from the sale of land in 1949. Petitioners' profit on liquidation was $191,876.45, or a total profit of $215,349.20. It is argued that the profit in 1949 is 10.84% of the total profit and was therefore a "substantial part" of it.

■ The real question posed by the statute, however, is not whether a substantial part of the total profit was realized prior to dissolution, but rather whether that part of the total profit realized *after* dissolution was substantial. This was the test correctly applied by the Tax Court in making its finding that the dissolution took place before a substantial part (nearly 90%) of the total profit was realized.

The opinion of the Tax Court adequately disposes of the other points raised by petitioners, and it is not necessary to discuss them at length here. See generally Burge v. Commissioner of Internal Revenue, supra, 253 F.2d 765, and Glickman v. Commissioner of Internal Revenue, 2 Cir., 1958, 256 F.2d 108.

■ Petitioner Wolfe failed to file a declaration of estimated tax for 1950, as required by the Code. This brings us to the separate issue raised in Wolfe's petition. The Commissioner assessed additions to tax under Section 294(d) (1) (A)[2] for Wolfe's failure to file the required declaration. Was it proper for the Commissioner to impose the further addition for substantial underestimation of tax under Section 294(d) (2)?[3]

2. Internal Revenue Code of 1939, as amended:
"§ 294. Additions to the tax in case of nonpayment
* * * * *
"(d) Estimated tax—(1) Failure to file declaration or pay installment of estimated tax—(A) Failure to file declaration
"In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *" 26 U.S.C.1952 ed. § 294.

3. Internal Revenue Code of 1939, as amended:
"§ 294. Additions to the tax in case of nonpayment
* * * * *
"(d) Estimated tax
* * * * *
"(2) Substantial underestimate of estimated tax. If 80 per centum of the tax (determined without regard to the credits under sections 32 and 35), in the case of individuals other than farmers exercising an election under section 60(a) or 66⅔ per centum of such tax so determined in the case of such farmers, exceeds the estimated tax (increased by such credits), there shall be added to the tax an amount equal to such excess, or equal to 6 per centum of the amount by

This question has met with a diversity of judicial opinion. The Tax Court and several district courts have permitted the double penalties on the theory that they are in accord with Congressional intent, and in harmony with Treasury Regulation 111, § 29.294–1(b) (3) (i), 26 C.F.R. (1949 ed.), which states that in the event of failure to file a declaration, the estimated tax shall be considered zero. G. E. Fuller, 1953, 20 T.C. 308; Clarence F. Buckley, 1957, 29 T.C. 455; Marcel Garsaud, 1957, 28 T.C. 1086; Walter H. Kaltreider, 1957, 28 T.C. 121; Palmisano v. United States, D.C.E.D.La.1958, 159 F. Supp. 98; Farrow v. United States, D.C. S.D.Cal.1957, 150 F.Supp. 581; Peterson v. United States, D.C.S.D.Texas 1956, 141 F.Supp. 382. Our own court has affirmed the Tax Court's imposition of the double additions in two recent cases, although the point was not specifically argued. Kaltreider v. Commissioner of Internal Revenue, 3 Cir., 1958, 255 F.2d 833; Clark v. Commissioner of Internal Revenue, 253 F.2d 745.

Foremost of those cases refusing to impose both penalties is the recent decision of the Sixth Circuit in Acker v. Commissioner of Internal Revenue, 1958, 258 F.2d 568. It restates the logical basis of other cases holding the penalties mutually exclusive: one who has filed no estimate at all cannot be said to have underestimated his tax. It goes further and decides that Treasury Regulation 111, § 29-294.1(b) (3) (i) is invalid on the point because it is "unreasonable and plainly inconsistent with the revenue statute," inasmuch as one penalty is

sufficient "to effectuate the statutory taxing scheme."

While recognizing that the Sixth Circuit decision is well-reasoned, we are compelled to disagree with it because of our view that Congress intended the exaction of both penalties in the event of the failure to file a declaration of estimated tax.

■■ An examination of the underestimation provisions of Section 294(d) (2), taken alone, leaves unanswered the question of whether the penalty provided should be imposed where no declaration of estimated tax is filed. The statute being ambiguous, resort to legislative history is proper in an endeavor to ascertain Congressional intent. The conference report explaining Section 294(d) (2) states: "In the event of a failure to file any declaration where one is due, the amount of the estimated tax for the purposes of this provision will be zero." H. Conf.Rep. No. 510, 78th Cong. 1st Sess. p. 56 (1943 Cum.Bull. 1351, 1372). The language of the Treasury Regulation is practically identical. As a regulation of long standing, it must be sustained unless "unreasonable and plainly inconsistent with the revenue statutes." Commissioner of Internal Revenue v. South Texas Lumber Co., 1948, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831. Here, the regulation is precisely in accord with the Congressional intent expressed in the conference report. The Tax Court properly sustained both the penalty for failure to file a declaration and for underestimation of tax.[4]

The decisions of the Tax Court will be affirmed.

which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. * * *" 26 U.S.C.1952 ed. § 294(d) (2).

4. Since the writing of this opinion, our attention has been called to the decision of

the Fifth Circuit in Patchen v. Commissioner of Internal Revenue, 1958, 258 F. 2d 544. There the court upheld the Tax Court additions both under § 294(d) (1) (A) and § 294(d) (2) where there was a failure to file the declaration of estimated tax.