**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**James B. KELLEY and Lena S. Kelley, and**

**John Waltman and Doris Waltman, Respondents.**

**No. 18185.**

United States Court of Appeals
Fifth Circuit.

Aug. 2, 1961.

David O. Walter, Harry Baum, Lee A. Jackson, Dept. of Justice, Washington, D. C., Claude R. Marshall, Sp. Atty., I. R. S., Hart H. Spiegel, Chief Counsel, I. R. S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., for petitioner.

William R. Frazier, Jacksonville, Fla., Hill & Frazier, James P. Hill, Jacksonville, Fla., for respondents.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The tax definition of a "collapsible corporation" illustrates again that the "difficulties of so-called interpretation arise when the legislature had no meaning at all; when the question which is raised on the statute never occurred to" the legislature.[1] In the matter now before us our difficulties come from the certainty of the general congressional purpose in enacting Section 117(m) of the Internal Revenue Code of 1939 and the uncertainty of the meaning to be extracted from language of the section that is, perhaps, Janus-faced. It seems hardly possible that Congress could have considered the specific question the Kelley-Waltman cases raise.

 In the Kelley-Waltman cases on appeal from the Tax Court[2] this Court must determine the meaning of the term *"a substantial part"* as that term is used in Section 117(m) of the Internal Revenue Code of 1939.[3] 64 Stat. 934 (1950);

---

1. John Chipman Gray, Nature and Sources of the Law 173 (1921 ed.)

2. These consolidated cases involved income tax deficiencies for the year 1952, asserted against James B. Kelley and Lena S. Kelley in the amount of $6,911.70 and against John Waltman and Doris Waltman in the amount of $63,212.60. The Tax Court found overpayments in the

amounts of $0.18 and $2.55. Waltman and Kelley were, respectively, President and Secretary of Island Shores, Inc.

3. "For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands

26 U.S.C.A. § 117(m). This section defines a collapsible corporation as one "formed or availed of * * * with a view to the sale or exchange of stock by its shareholders * * * prior to realization by the corporation * * * of a substantial part of the net income to be derived [4] from [its] property, and the realization by such shareholders of gain attributable to such property". If Island Shores, Inc., the corporation in question here, was a collapsible corporation in 1952, Kelley and Waltman, the taxpayers (stockholders), should have reported the gain from the sale of their stock as ordinary income; they reported it as a capital gain.[5]

Section 117(m) has been said to confront the Court with the necessity of choosing one of two conflicting meanings, each of which may be defended on grammatical and semantic grounds.[6] Does "a substantial part" mean the part already realized or does it mean the part not yet realized? After this choice is made, the Court must then determine how much is "substantial"?

There is no dispute over the facts.[7] In 1952 Island Shores had realized one-third

---

of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and (ii) the realization by such shareholders of gain attributable to such property." Section 117(m) (2) (A), Internal Revenue Code of 1939. In the 1954 Code Section 341, 26 U.S.C.A. § 341 is the counterpart of Section 117(m).

4. In determining the "income to be derived" the total net income which will eventually be derived from the property is estimated as of the date of the sale, exchange, or distribution—assuming that there had been no sale, exchange, or distribution. See Rose Sidney, 1958, 30 T. C. 1155, affirmed 2 Cir., 1960, 273 F.2d 928. This is consistent with the statutory language, "net income to be derived from such property"; but there is a serious question whether the phrase "to be derived" refers only to the value of the assets at the sale or liquidation. In this case there is no dispute over the Tax Court finding that Island Shores had realized one-third of its anticipated total net income.

5. "Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset." Section 117(m) (1), Internal Revenue Code of 1939.

6. "The clause 'prior to the realization * * * of a substantial part of the net income to be derived from such property' can conceivably be given either of two meanings. The first, which is probably intended, would interpret the provision to mean that a susbtantial part of the total net income must be realized before the sale or liquidation. The second, also grammatically correct, would interpret the provision to mean that no substantial part of the total net income remains to be derived from the property at the time of the sale or liquidation. The committee reports do not make clear which of these interpretations is intended. As in the case of the statute itself, the numerous general statements in the Regulations using the phrase 'income to be derived' can be read both ways, although probably it will be more readily assumed that they refer to the part of the income realized before the sale or exchange." McLean, Collapsible Corporation, 67 Harv.L.Rev. 55, 67 fn. 18 (1953).

7. In April 1950 the taxpayers formed Island Shores, Inc., a Florida corporation, to buy and subdivide a tract of land on Estero Island, a short distance from Fort Myers, Florida. The corporation purchased the tract for $150,000 and spent about $30,500 on improvements. Before closing the purchase, the taxpayers submitted plans to the Federal Housing Authority to obtain FHA-guaranteed financing for a subdivision and a hotel. Later, they learned that they could not meet FHA standards unless they made costly improvements to raise the ground level of the island a minimum of four or five feet and to build a sea-wall. They attempted to find private financing to construct a

of the total net income it might expect to derive from its property. The Tax Court held that the definition of a collapsible corporation looks to the income already realized and that one-third is a substantial part; that Island Shores, therefore, was not a collapsible corporation in 1952. We agree. Unfortunately, this result falls short of accomplishing the full objective of the statute [8] but, required to choose between two possible constructions, we feel compelled to give effect to the one that more naturally conveys the ordinary meaning of the words as they are written in the statute.

## I.

The collapsible corporation is a brain child of resourceful tax advisors to the motion picture and the construction industries. By using corporate trappings taxpayers, before 1950,[9] were able to cloak a single venture or short-term project with the appearance of a long-term investment; for example, a corporation would be organized to produce a single picture, the director and actors would receive stock instead of salaries, and the stock would be sold or the corporation liquidated as soon as the picture was made. Congressional committee reports describe the collapsible corporation as "a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates [20 per cent to 91 per cent for individuals and from 30 per cent to 52 per cent for corporations] to a long-term capital gain taxable only at a rate of 25 per cent".[10]

hotel on the site but were unsuccessful. In December 1950 the corporation began selling lots, and during the following months it sold about one-third of the land. In May 1950 Waltman, the principal shareholder, announced that because of his wife's poor health he would have to go to another climate for a considerable period of time and that he was considering a permanent move to another area; the Waltmans spent the summer of 1951 in Colorado because of Mrs. Waltman's poor health. In October 1951 five of the shareholders, who were directors and owners of fifty per cent of the stock, sold their stock to the corporation. After the withdrawal of these shareholders Waltman owned five-sixths of the stock and Kelley one-sixth. The following month a syndicate offered to buy all of the land still owned by the corporation. Waltman and Kelley decided to sell. Accordingly, they transferred the stock to the purchasers for $192,666 and liquidated the corporation.

The taxpayers made three contentions before the Tax Court: (1) that they did not at any time have any intention of forming or availing of the corporation with a view of collapsing it. (2) that they sold their stock in 1952 as a result of circumstances arising after the purchase and development of the corporation and therefore, under Regulation 111, section 29.117, 11(b), section 117(m) is inapplicable; (3) that the corporation is not within the statutory definition of a collapsible corporation. The Tax Court found it unnecessary to decide the first two contentions as do we.

8. Commentators usually condemn the section. Two well-known authorities write, for example: "[Section 117(m)] is a patchwork of interlaced problems of interpretations. For recurring obscurities of meaning it is hard to surpass. Neither well conceived nor well drafted, it is replete with vague concepts and obscure or faulty phraseology". DeWind and Anthoine, Collapsible Corporations, 56 Col. L.Rev. 475, 534 (1956). But as the court observed in Levenson v. United States, D.C.N.D.Ala.1957, 157 F.Supp. 244, 250: "It ill becomes this court to criticize the language employed by the Congress in drafting a Revenue Act. It is quite easy to observe after the event has occurred that in lieu of 'substantial' the Congress might have employed a percentage to express its true meaning. However, this court has been impressed time and again more often with the excellence of legislative draftsmanship than with its deficiencies."

9. Even before the Revenue Act of 1950 adopted the term "collapsible corporation" as a statutory concept, the Commissioner sought to deny capital gains treatment on the ground that the corporate entity should be ignored. See Herbert v. Riddell, D.C.Cal.1952, 103 F.Supp. 369.

10. H.Rep.No.2319, 81st Cong., 2d Sess. 96 (1950-2 Cum.Bull. 380, 449; S.Rep.No. 2375, 81st Cong., 2d Sess., 88 (1950-2 Cum.Bull. 483, 546); 1950 U.S.Code Cong.Serv. pp. 3099, 3145, 3232. See similar statements in President Truman's message to Congress, January 23, 1950,

The problem before Congress was how to prevent taxpayers' conversion of ordinary income into capital gain through the use and abuse of the corporate form. Congress attacked the problem on the shareholder level, not on the corporate level; Section 117(m) defines a collapsible corporation and denies long-term capital gain treatment when the shareholders sell their stock in such a corporation or liquidate the corporation. The policy of the law is to require realization of income at the corporate level but to visit the sins of collapsibility on the shareholders by converting all of their gain into ordinary income. The resulting uncertainty over the meaning of Section 117(m) makes the solution somewhat less than wholly successful.[11]

As the Commissioner sees it, the test of collapsibility is whether a substantial part of the total net income remains to

H.Doc.No.451; Hearings before Committee on Ways and Means on Revenue Revision of 1950, 81st Cong., 2d Sess. 2, 5 (1950); and see the statement of Secretary Snyder, id., at 7, 20. See particularly Honaker Drilling, Inc. v. Koehler, D.C.Kan.1960, 190 F.Supp. 287, 292.

As originally conceived, the device called for the formation of a temporary corporation to construct or to produce one property. The stockholders, after holding the stock more than six months but before the corporation realized any considerable income, would sell their stock taking a long-term capital gain. The purchaser could then liquidate the corporation at no tax cost to him, taking as a basis for the corporate property the price he paid for the stock. If instead of selling their stock, the shareholders liquidated the corporation, a subsequent sale of the property acquired resulted in no additional tax because the basis of the property in the shareholders' hands was the fair market value at the time of distribution. Taking advantage of this loophole in the tax laws, prior to 1950, it was not uncommon for taxpayers to form a corporation to produce a single motion picture. After completing the picture, but before realizing any income, the incorporators would liquidate the corporation or sell their stock. In exchange for their stock the shareholders would receive undivided interests in the assets, and pay a capital gains tax on the difference between the cost of the stock and the fair market value of their undivided interests in the property at the time of liquidation. The entire proceeds from distributing the motion picture would be treated as a tax free return of capital. The same tax-saving device was often used by building contractors in the construction of a subdivision or a large apartment house.

11. The statute has produced a plethora of comment, a large part of it critical of the draftsmanship. See Weithorn, Collapsible Corporations: 1960 Status, 19 N.Y.U.Tax Inst. 593 (1961); Symposium—Collapsible Corporations, What is and What is not Collapsible, 12 Journal of Taxation 194 (1960); Ryan—Payne, Kelley, other recent cases, add new uncertainty to collapsible provisions, 12 Journal of Taxation 71 (1960); Hewitt, Tax Court makes specific the "substantial part" collapsible test, 11 Journal of Taxation 10 (1959); Bittker, Federal Income Taxation of Corporations and Shareholders, Chapter 10, p. 306 (1959); Wood and Shackelford, Corporate Tax Planning, 27 Tenn.L.Rev. 213 (1959); Modrall, Collapsible Corporations and Subsection (e), 37 Taxes 895 (1959); Axelrad, Recent Developments in Collapsible Corporations, 36 Taxes 893 (1958); Anthoine, Federal Tax Legislation of 1958: The Collapsible Election and Collapsible Amendment, 58 Col.L.Rev. 1146 (1958); Friedman and Silbert, Collapsible Corporations in 1958, 16 N.Y.U.Tax Inst. 665 (1958); Wilkins, Collapsible Corporations, 1958 Tul.Tax Inst. 511; Anthoine, Collapsible Corporations; 1957 Developments, 15 N.Y.U.Tax Inst. 659 (1957); Seidman, "Collapsible" Corporations—Application to Real Estate Transactions, 15 Tax L.Rev. 121 (1959); Leist, Tax Tips on Handling the Personal Holding Co. and Collapsible Corporations, 6 Journal of Taxation 74 (1957); Herzberg, Saving Taxes Through Capital Gains 215–19 (1957); Taubman, Motion Picture Co-Production Deals and Theatrical Business Organization, 11 Tax L.Rev. 113 (1956); Axelrad and Kostas, A Re-Examination of Collapsible Corporations "with a view to" Coexisting with Section 341, Proc.Tax Inst.U. of Cal. 549 (1956); Axelrad, Tax Advantages and Pitfalls in Collapsible Corporations and Partnerships, 34 Taxes 841 (1956); DeWind and Anthoine, Collapsible Corporations, 56 Colum.L.Rev. 475 (1956), reprinted in 1 Tax Counsellors' Quarterly (2 parts) (1957); Weyher and Bolton, Collapsible Corporation as Affected by the 1954 Code—Inventory

be realized *after* the date of the taxpayers' sale of stock. Here, according to the Commissioner, since two-thirds of Island Shores' income had not been realized, the sale occurred "prior to the realization by the corporation of a substantial part of the total net income to be realized". According to the taxpayers, one-third is a substantial part and since they sold their stock *after* a substantial part of the total net income had been realized the sale did not occur prior to the realization of a substantial part. The grit in the oil is that *a* substantial part has already been realized, but *a* substantial part remains to be realized, leaving "plenty of life in the collapsible corporation device".[12]

For authority, the Commissioner relies on two cases: Abbott v. Commissioner, 3 Cir., 1958, 258 F.2d 537, affirming 1957, 28 T.C. 795 and Payne v. Commissioner, 5 Cir., 1959, 268 F.2d 617, affirming 1958, 30 T.C. 1044.

In Abbott, 258 F.2d 537, 542, the Court said:

"Petitioners make a final contention that Leland was not a collapsible corporation because it had already realized a 'substantial part' of the net income to be derived from the property. The corporation realized $23,472.75 profit from the sale of land in 1949. Petitioners' profit on liquidation was $191,876.45, or a total profit of $215,349.20. It is argued that the profit in 1949 is 10.84% of the total profit and was therefore a 'substantial part' of it." ¶"The real question posed by the statute, however, is not whether a substantial part øf the total profit was realized prior to dissolution, but rather whether that part of the total profit realized *after* dissolution was substantial. This was the test correctly applied by the Tax Court in making its finding that the dissolution took place before a substantial part (nearly 90%) of the total profit was realized."

The Third Circuit's interpretation of the Tax Court's decision in Abbott was a surprise to the majority of the Tax Court in the instant case.[13] Judge Kern, writing for the majority, pointed out, in a care-

and Unrealized Receivables, 13 N.Y.U.Tax Inst. 657 (1955); Ginsberg, Income Taxation of Collapsible Corporations, 4 Buffalo L.Rev. 325 (1955); Freeman, Collapsible Corporations, 11 N.Y.U.Tax Inst. 407 (1953); McLean, Collapsible Corporations—the Statute and Regulations, 67 Harv.L.Rev. 55 (1953); Greenfield, Effect of Collapsible Corporations Provisions on Real Property Holding, 10 N.Y. U.Tax Inst. 91 (1952); Boland, Practical Problems of the Collapsible Corporation, 10 N.Y.U.Tax Inst. 537 (1952); Note, Legislative Response to the Collapsible Corporation, 51 Colum.L.Rev. 361 (1951); Glicksburg and Stephens, Metaphorical Tax Legislation: The Collapsible Corporation, 8 Wash. & Lee L.Rev. 145 (1951); Miller, Capital Gains Taxation Under the Revenue Act of 1960, 9 N.Y.U.Tax Inst. 675, 683 (1951); Schlesinger, The Collapsible Corporation Through the Looking Glass, 29 Taxes 895 (1951); DeWind, Collapsible Corporations under the Revenue Act of 1950, Proc.Tax Inst.U. of So. Calif. 583 (1951); Bittker and Redlich, Corporate Liquidations and the Income Tax, 5 Tax L.Rev. 437 (1950); Altman, Collapsible Corporations, 28 Taxes 1013 (1950); see generally Mertens, Federal Income Taxation, §§ 22.54–22.58; Holzman Corporate Reorganizations, Their Federal Tax Status, 7 N.Y.U. (1956).

12. Bittker, Federal Income Taxation of Corporations and Shareholders 307 (1959).

13. It was a surprise to most of the legal commentators. "This [the court's approach in Abbott] is an approach for which no precedent exists. Legislative history [Sen.Rep.No.7375, 81st Cong.2d Sess. 89 (1950) and H.Re.Rep.No.2319, 81st Cong.2d Sess. 97 (1950)], the statute itself, the Regulations [Reg. § 1.341–5(c) (2)], and existing case law all indicate that the 'substantial realization' referred to in the collapsible definition must take place at the corporate level." Weithorn, Collapsible Corporations: 1960 Status, 19 N.Y.U.Tax Inst. 593, 603 (1961). "In view of the attitude of the Service, the Congressional purpose, and the understanding of the tax bar, the Abbott case is shocking." Axelrad, Recent Developments in Collapsible Corporations, 36 Taxes 893, 895 (1958). "Until the

fully reasoned opinion: "With all due deference to the Court of Appeals for the Third Circuit, we were not aware that we made the finding and applied the test referred to in the above question." Judge Kern said that in Abbott the Tax Court simply held, inferentially, that 10.8 per cent, already realized at the date of liquidation, was not a substantial part:[14]

"[In Abbott] we were concerned with the question of whether 'only the property actually sold by the corporation can be regarded as giving rise to the income from the transaction' or whether the enhancements in value to the property arising from commitments made by the corporation but carried out by the stockholders after its dissolution could also be considered. Having resolved this question, we found as a conclu-

sion of fact that '[w]hen Leland [the corporation] distributed the land to petitioners [the stockholders], it had not realized a substantial part of the net income to be derived from the property.' In that case the 'part of the net income to be derived from the property' which had been realized by Leland at the time of its dissolution was approximately 10 per cent of such income. Therefore, we inferentially held in that case that 10 per cent of the net income to be derived from the property was not a substantial part thereof." 1960, 32 T.C. 135.

Expressly rejecting the view imputed to it,[15] the Tax Court found that "the question to be decided is whether the *realized* income is a substantial part of the net income to be derived.[16] * * * [T]here

appellate decision in Abbott, 3 Cir., 1958, 258 F.2d 537, nearly everyone had assumed, apparently, that a corporation would not meet the collapsible definition if, at the time of the sale or distribution, it had already realized a substantial part of the income expected to be derived from its property. This construction is the obvious one that would be derived from a reading of the statute, and there is nothing contrary in the Regulations or Congressional Committee Reports." Ryan, Payne, Kelley, Other Recent Cases, Add New Uncertainty to Collapsible Provisions, 12 Journ. of Taxation 71 (1960).

Informal rulings issued prior to the spring of 1956 interpreted "substantial part" as referring to the realized income. Axelrad, Tax Advantages and Pitfalls in Collapsible Corporations and Partnerships, 34 Taxes 841 (1956) ; Axelrad, Recent Developments in Collapsible Corporations, 36 Taxes 893 (1958). In the only clear reference in the Regulations, U.S.Treas.Reg. 111, § 29.117-11 (1953), Example 4 refers to the sale of the stock at a date when the corporation "has realized" a substantial part of the net income to be derived from each of its productions except the last.

14. Cf. "The court of appeals' statement that its test, that 'substantial part' refers to the unrealized portion, was applied by the Tax Court is questionable. The Tax Court's view that a substantial part had not been realized is fully consistent with the conclusion that 10.84 per cent was not

itself substantial. * * * " Axelrad, Recent Developments in Collapsible Corporations, 36 Taxes 893, 895 (1958). "The result in [Abbott] where only 10 per cent of the profit was realized before liquidation can be easily defended; but it is difficult to find support in the statute for its theory that a substantial amount of *unrealized* income is fatal." Bittker, Federal Income Taxation of Corporations and Shareholders 306 (1959).

15. Five judges on the Tax Court dissented. Judge Opper, author of the dissenting opinion in Kelley, wrote the Tax Court opinion in Abbott. In his short dissenting opinion in Kelley, Judge Opper said: "[T]he only appellate court which has spoken, clearly views the critical words as meaning the opposite of what is now being accepted. Abbott v. Commissioner, (C.A. 3) 258 F.2d 537, affirming 28 T.C. 795. And this was not a reversal of a Tax Court opinion but its affirmance. Cf. Arthur L. Lawrence, 27 T.C. 713, revd. (C.A. 9) 258 F.2d 562." The dissent relies on the general legislative purpose to preclude transformation of "substantial" amounts of ordinary income into capital gains. The dissent also questions whether the legislative purpose can be fulfilled if anything less than fifty per cent of the total net income should be considered as being a substantial part of the whole.

16. Judge Kern cited Rose Sidney, 1958, 30 T.C. 1155, affirmed 2 Cir., 1960, 273 F.2d 928, in which the Tax Court said:

may be two (or more) substantial parts of a whole, and therefore a finding that the unrealized part of such net income is substantial does not preclude a finding that the realized part of such net income is substantial".

The Commission relies also on certain language of this Court in Payne v. Commissioner, 5 Cir., 1959, 268 F.2d 617, 622, affirming 1958, 30 T.C. 1044. We there stated that "the Tax Court could properly find on the record that a substantial part of the income of the corporations remained to be realized over the 35 remaining years of their expected life".[17] The questions before us in Payne are not before us here. The basic question there was whether the plan of stock redemption had been established at the time the corporation was formed; there was no consideration of the question here presented. The taxpayers and the Commissioner took it for granted that the corporation would not be deemed collapsible unless the distribution was made before the corporation had realized any substantial portion of its income, and the Tax Court decision was based on the finding that no substantial portion of income had been realized. Although the language of the Payne opinion when taken by itself may tend to suggest the interpretation of the statutory phrase "a substantial part" here urged by the Commissioner, its more natural meaning when viewed in context is that it was intended simply to affirm the findings of the Tax Court, that the earnings of the corporation at the time of the distribution did not constitute "a substantial part". In short, neither Payne nor Abbott is controlling here.

In Levenson v. United States, D.C.Ala. 1957, 157 F.Supp. 244, the only case in which the interpretation of "a substantial part" was clearly posed for decision, the district court looked to the already realized portion of the income as determinative of the question. In Levenson a corporation was formed in July 1953 to carry on a business conducted by a partnership. The partnership assigned to the corporation a contract to purchase 3,495 trailers. By February 15, 1954, the corporation had sold 1,795 trailers, thereby realizing 51.37 per cent of the entire net income to be derived from the 3,495 trailers. February 15, 1954, the taxpayers sold all their stock, and four days later the buyers liquidated the corporation. The court concluded that the 51.37 per cent already realized constituted a substantial part of the net income to be derived from all of the corporate property and, accordingly, held that the corporation was not collapsible. Levenson, therefore, plugs the loophole just about halfway. The Commissioner did not appeal.

The weakness in the Commissioner's argument is the assumption that there can be only one substantial part of a whole. There is no logical or legal basis for this assumption. There were certainly two substantial parts of a whole in Levenson. Unquestionably there would be two substantial parts if each were fifty per cent of the whole. The brief for the Commissioner states: "Specifically, the issue is whether this two-thirds portion constituted the 'substantial part of the net income to be derived from the property'." But Section 117(m) does not use the definite article "the" in referring to "substantial part". The statute does not require that the substantial part be realized or that substantially all of the total income be realized or that

---

"In determining what is 'a substantial part of the net income to be derived from such property' we must consider the relationship between net income realized by the corporations prior to the distributions and the whole of the net income which may be reasonably anticipated to be derived from such property."

**17.** If this statement in Payne is to be taken as literally as the Commissioner takes

it, a corporation would be collapsible even though it had realized all the total net income to be derived from its property. This is contrary to the Regulations, which treat the *actual* realization, not the *intended* realization as controlling. See Rev.Rul. 58–241, 1958–1 CB 179; Rev. Rul. 56–104, 1956–1 CB 178; Rev.Rul. 56–50, 1956–1 CB 174; Reg. § 1.341–2(a) (4) and Reg. § 1.341–5(c) (2).

the part unrealized be insubstantial in relation to the part realized, in order for a corporation to escape collapsibility. It is necessary to read some such language into the statute in order to construe Section 117(m) as the Commissioner would have us construe it. Section 117(m) requires only that "*a* substantial part" be realized. The indefinite article "a" says in plain language that there may be two or more substantial parts.[18] Accepting the statute at its face value—what Congress said, not necessarily what Congress might have intended to say if this case had been presented as a specific problem for legislative resolution—when the first "substantial part" is realized, the statutory requirement is met, and it is immaterial that another substantial part remains to be realized. Mr. Justice Holmes succinctly stated the limits of judicial inquiry in such a case: "We do not inquire what the legislature meant; we ask only what the statute means." Holmes, Collected Legal Papers 207 (1920).

Courts are not captives of grammars and dictionaries. Neither are they free to ignor common usage and dictionary-tested meaning—especially in the field of tax legislation, where the necessities of the subject require technically exact language and certainty of meaning.

■ Still, a statutory provision must be construed in context and in harmony with the statutory purpose. There is nothing in the legislative history or in the factual setting that produced Section 117(m) to indicate that Congress de-signed the law to penalize the reasonable use of the corporate form of enterprise. The problem Congress faced was *not only* "how to prevent avoidance of ordinary tax rates by the use of the corporate vehicle [*but also how to do so*] without changing the basic scheme of corporate-shareholder taxation and without introducing excessively intricate statutory provisions".[19] Congress was aiming at abuse of the corporate entity. The committee reports show that Section 117(m) was adopted in the light of problems raised by "one shot" motion pictures and one-project building corporations when stock in such corporations was sold or the corporation was dissolved, as described in Senate Report 2375, before "any" income was realized.

The legislative approach to taxing capital gains has not been distinguished for clarity or consistency. From time to time some have questioned the policy and the whole tax treatment of capital gains. Nevertheless, since 1921 our tax scheme has embraced the principle that a capital gain is not really income; that the gain from the sale of stock is a capital gain, not ordinary income. The concept of a collapsible corporation is an exception to that principle aimed at a particularly outrageous example of taxpayers' overreaching of which the instant case is not characteristic. Such an exception is in derogation of the general rule governing the sale of capital assets. The "all-or-nothing" approach [20] of Section 117(m) has, in fact, certain penal

18. "In Webster's New International Dictionary, published in 1926, *a* is defined as 'one or any—without special emphasis on the number.' The letter *A* was derived from Anglo-Saxon *an*, 'one,' the same word as the numeral. For a long time it was used as *an* 'one,' but for reasons of euphony it lost the *n* before words beginning with the consonant sound. Gradually it lost its definite meaning of 'one' and became indefinite. It is now known as one of the indefinite articles, which may signify 'one' or 'any.' The word *any*, meaning one indifferently out of a number, goes back to Anglo-Saxon *aenig*, a variation of *an*. * * * More often *a* has the indefinite meaning, although it did originally mean 'one.'" Bryant, English in the Law Courts 39 (1926). See also the definition of "one" in Partridge, Word Origins 451 (1958). Webster's New International Dictionary (1957) defined "a" as "one" or "any." The Oxford English Dictionary (1933) defines "a" as "one, same, any: the oneness or indefiniteness, being implied rather than asserted."

19. Modrall, Collapsible Corporations and Subsection (c), 37 Taxes 895 (1959).

20. The phrase used by Cohen, Surrey, Tarleau, Warren, Tax Treatment of Sales of Business, 54 Col. 157, 173 (1954) dis-

implications: here, for example, there is surely some part of the gain that is properly a capital gain. It seems to us, therefore, that a court should not give such an exception a broad-brush interpretation based on, first, the court's finding that Congress intended to plug the loophole more tightly than Congress said it was plugging the loophole, then, the court's supplying appropriate verbiage in the name of legislative intent.

The effect of our holding is to leave the loophole two-thirds open to these taxpayers.[21] Section 117(m), as we feel we should construe it, seems therefore a poor sort of tool for plugging loopholes. But the best workman can work only with the tools he has. If Congress wants a better job done, Congress should provide a tool that will not just plug the loophole "a substantial part of the way".

## II.

The next step is to determine what amount constitutes a "substantial" realization. The committee reports and the statute do not hint at the definition of this term. Nor is resort to other areas satisfactory.[22] We think that the term is a relative one.[23] Without reading too much into the silence of Congress, it seems to us that if the test were to be mechanically applied by the use of an arbitrary percentage, Congress would have phrased the statute in terms of a percentage of the income. Not having

cussing the American Law Institute's proposed revision of the federal income tax laws.

21. "In private rulings the Commission has until recently followed the informal rule that, if at least 50% of the total taxable income of the property had been realized, then a 'substantial' part will be deemed to have been realized. * * *" 3B Mertens, Law of Federal Income Taxation, c. 22, p. 256 (1958). This of course is only one-sixth more than the part considered substantial in the instant case.

22. In the following cases a test of "substantial part" was held to be met: Schainman v. Dean, 9 Cir., 1928, 24 F.2d 475 ($4,000 out of stock of goods valued at $20,000 to $25,000; Frank v. McMeekan, D.C.E.D.N.Y.1944, 56 F.Supp. 369 (less than 50 per cent of activity in interstate commerce); Tax Commission of Ohio v. American Humane Education Soc., 1931, 42 Ohio App. 4, 181 N.E. 557 (1/48th of total expenditures of a charity). A test of "substantial part" was held not to be met in: Ullo v. Smith, D.C.S.D.N.Y.1945, 62 F.Supp. 757 (less than 20 per cent of activity in interstate commerce); Vogelpohl v. Lane Drug Co., D.C.N.D. Ohio 1944, 55 F.Supp. 564 (1½ per cent to 5 per cent of activity in interstate commerce); In re Holterman's Will, Sur. 1950, 102 N.Y.S.2d 342 (6 per cent of legacy); Commonwealth ex rel. Piccerelli v. Smith, 1942, 150 Pa.Super. 105, 27 A. 2d 484 (2½ years of 10 to 30 years' sentence).

23. In Farmers' Loan & Trust Co. v. Bowers, 2 Cir., 1938, 98 F.2d 794 the estate tax of William Waldorf Astor was in question. One of the issues was whether gifts had been made in contemplation of death; that involved the question of substantiality in relation to the whole estate. The circuit court approved the district court's instructions on the meaning of "substantial." The district court charged the jury:

"I mean by 'substantial' considerable, material, not trifling, not inconsequential. When you speak of a 'substantial' part of a man's estate, you mean—oh, I do not know—10 per cent or 20 per cent or something like that. Now, that is 'substantial'. I would say that 1 per cent is probably not substantial. It means fair-sized. * * * [T]hat is a matter of law, and you may substitute for the word 'substantial', if you like, 'material' or 'considerable'. Those words are synonymous. But that is matter of law, as I charged you in my charge before. That is not matter of fact. It is for you to say whether that motive was substantial, in that sense.

"'A Juror: Your Honor, your definition was 10 or 20 per cent? Is that correct?

"'The Court: I cannot be pinned down to a figure, gentlemen. One of you suggested figures on a percentage basis. "Substantial," "material," "considerable," "consequential," or a "fair-sized" cause. A fair-sized cause would describe it—not necessarily 51 per cent or 50 per cent. It is hard to figure these things on a percentage basis.

"'A Juror: Out of $100, what would you consider a substantial amount?

"'The Court: Well, I might consider $20 a substantial amount, or $15 a substantial amount, but that I cannot charge you as matter of law, of course.'"

**914**

done so, the recurring question must be resolved on the facts of each case, giving weight to the findings of the Tax Court. We have no litmus-paper test. The ordinary dictionary meaning of "substantial" is: "Considerable, in amount, value or the like; large, as a *substantial* gain" (Webster's New International Dictionary (2d Ed. unabridged 1958); "of ample or considerable amount, quantity or dimension" (Oxford English Dictionary 1933). We agree with the Tax Court that, giving the word "substantial" its ordinary meaning, one-third constitutes a substantial part.

In summary, we hold that the term "a substantial part" in Section 117 (m) (2) (A) of the Internal Revenue Code of 1939 refers to the realized, not to the unrealized, portion of the income; we hold that the one-third already realized constitutes "a substantial part" of the total net income to be derived from the property by the corporation. We affirm the decision of the Tax Court that Island Shores, Inc., was not a collapsible corporation in 1952. The opinion of the Tax Court is hereby

Affirmed.

RIVES, Circuit Judge (dissenting).

Faced with the choice of one of two conflicting meanings of Section 117(m), I would say that "a substantial part" has reference to the part not yet realized. That construction would carry out the overriding legislative purpose, which was to prevent transformation of ordinary income into capital gain. To concur with the majority in this case, I would have to think that Congress did not intend to close a loophole, but intended to close it only a part of the way, and to leave the loophole two-thirds open to taxpayers bent on saving taxes by the use of collapsible corporations. I cannot conceive that, in its enactment of a corrective statute, Congress intended to leave such a gaping loophole. We should adopt a rule of statutory interpretation which strikes more directly at the evil at which Congress aimed. I therefore respectfully dissent.